# Syllabus

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kimberly K. Muschong

*In re* APPLICATION OF ENBRIDGE ENERGY TO REPLACE AND RELOCATE LINE 5

Docket Nos. 168335, 168336, 168337, 168338, 168339, and 168346. Argued March 16, 2026 (Calendar Nos. 2 and 3). Decided July 31, 2026.

These consolidated appeals involve the intersection of three legal frameworks—1929 PA 16 (Act 16), MCL 483.1 *et seq.* (giving the PSC primary authority to regulate pipelines in Michigan); Michigan's environmental protection act (MEPA), MCL 324.1701 through MCL 324.1706; and the common-law public trust doctrine—and the order of the Michigan Public Service Commission (PSC) approving Enbridge Energy Limited Partnership's application to construct a tunnel under the Straits of Mackinac to house a portion of its Line 5 pipeline (the "Replacement Project"). The PSC granted Enbridge's predecessor approval to construct Line 5 in 1953, and the Michigan Conservation Commission also granted it an easement to construct two 20-inch pipes (referred to as the dual pipelines) located on or suspended above the lakebed across the Straits. As part of a negotiated agreement between the state and Enbridge in 2017 through 2018, the Replacement Project contemplated the decommissioning of the dual pipelines and the construction of a concrete-lined tunnel under the Straits' lakebed and a new 30-inch pipe through the tunnel. In 2018, the Legislature created the Mackinac Straits Corridor Authority (MSCA) and authorized it to enter into an agreement to build a "utility tunnel" under the Straits. The Department of Natural Resources granted the MSCA an easement to construct a tunnel under the Straits, and once Enbridge completes the tunnel, the MSCA will take ownership of the tunnel and provide Enbridge with a 99-year lease.

After Enbridge filed its application for the Replacement Project with the PSC, appellants, Bay Mills Indian Community, Grand Traverse Band of Ottawa and Chippewa Indians, Little Traverse Bay Bands of Odawa Indians, Nottawaseppi Huron Band of the Potawatomi, Environmental Law and Policy Center, Michigan Climate Action Network, and For Love of Water, intervened in the proceedings to oppose the Replacement Project. Appellees Michigan Laborers' District Council, Michigan Propane Gas Association, and National Propane Gas Association intervened to support the project.

The PSC referred the matter to an administrative law judge (ALJ) to conduct proceedings and build a record. Relevant to this appeal, the parties disputed the proper scope of the PSC's analysis under MEPA. Enbridge filed a motion in limine seeking to exclude as legally irrelevant various issues from the PSC's consideration, including the construction of the utility tunnel, the

environmental impact of the tunnel construction, the public need for and continued operation of Line 5, the current operational safety of Line 5, whether Line 5 has an adverse impact on climate change, and the intervening parties' climate change agendas. The ALJ granted the motion as to all issues other than the construction of the utility tunnel, and several intervenors appealed the ruling to the PSC. While that appeal was pending, Governor Gretchen Whitmer issued a notice of revocation of the 1953 easement. The PSC remanded the case to the ALJ to consider the impact of the Governor's actions.

On remand, the ALJ reached the same conclusions as he had before. He found that the PSC's 1953 order had already established that Line 5 served a public need and that this finding had no expiration date. The ALJ further concluded that Governor Whitmer's actions could not "be used to expand the scope of this case to include an examination or determination of the public need for Line 5, or any aspect of its operation and safety." The intervenors again appealed, and the PSC largely affirmed the ALJ's ruling. Like the ALJ, the PSC determined that its 1953 decision approving Line 5, as well as earlier Supreme Court caselaw, established that the pipeline complied with Act 16 and that there was no expiration date for this finding. Accordingly, it concluded that the Act 16 analysis in this case should be limited to the Replacement Project and not the pipeline as a whole. The PSC limited its MEPA analysis "to the conduct at issue in this case," i.e., the Replacement Project, and refused to consider evidence of potential pollution, impairment, and destruction of Michigan's natural resources resulting from existing sections of Line 5, including the danger of oil spills. It also concluded that its MEPA analysis did "not extend to the entirety of Line 5," but was limited to the single new pipeline and tunnel. However, the PSC also determined that the conduct at issue included the products flowing through the new pipeline section and allowed the introduction of evidence of the greenhouse gas emissions that would result from the consumption of the products. The PSC also concluded that greenhouse gases were "pollution" within the meaning of MEPA and that although the Replacement Project was limited to the 4-mile section of the pipeline described in the application, MEPA review was necessary because that pipeline section would involve hydrocarbons that may result in pollution.

After the presentation of additional evidence and testimony, the ALJ closed the record and transferred the case to the PSC for a final decision. The PSC issued an order granting Enbridge approval under Act 16 to construct the Replacement Project. It found that the requirements of both Act 16 and MEPA were satisfied and that there were no feasible or prudent alternatives to the Replacement Project, but it declined to consider the public trust doctrine in its analysis.

Appellants appealed the PSC's ruling to the Court of Appeals. In a published per curiam opinion, the Court of Appeals, M. J. KELLY, P.J., and LETICA and WALLACE, JJ., affirmed. ___ Mich App ___ (February 19, 2025) (Docket Nos. 369156, 369157, 369159, 369161, 369162, 369163, 369165, and 369231). Appellants sought leave to appeal, and the Supreme Court granted the applications. ___ Mich ___; 25 NW3d 327 (2025) (Docket Nos. 168335 to 168339); ___ Mich ___; 25 NW3d 319 (2025) (Docket No. 168346).

In an opinion by Justice WELCH, joined by Chief Justice CAVANAGH and Justices BERNSTEIN, BOLDEN, THOMAS, and HOOD, the Supreme Court *held*:

Courts must review de novo an agency's application of MEPA, regardless of whether a case commences in court or in administrative proceedings. MEPA requires (1) consideration of the environmental impact factually and proximately caused by the conduct at issue, (2) a fair and reasoned comparison of the environmental impacts of any alternatives to the conduct considered, and (3) consideration of the conduct's potential effects on public trust resources. The Court of Appeals erred in this case by applying a deferential standard of review to the PSC's decision, and the PSC erred by (1) failing to consider whether the tunnel project will factually and proximately cause the extension of Line 5's operational life, potentially resulting in additional environmental harm; (2) comparing alternatives in an inconsistent manner; and (3) failing to consider the project's impact on public trust resources.

1. The Court of Appeals erred by applying a deferential standard of review to the PSC's MEPA determination rather than analyzing de novo whether the proposed conduct satisfies MCL 324.1705(2). MEPA decisions are reviewed de novo whether they originate as an administrative proceeding or through direct litigation in court, meaning that the reviewing court must consider the legal issues independently and review the record without deference to prior proceedings. Nothing in MEPA's text implies the existence of multiple standards of review, and interpreting the provision at issue in this case—MCL 324.1705(2)—to provide for de novo review of administrative agencies' MEPA determinations is consistent with both the language of MEPA as a whole and MEPA's purpose of spurring the development of a common law of environmental quality through judicial decisions. The Court previously determined that MCL 324.1704(3) requires a court to independently and nondeferentially review an agency decision after remitting a case to that agency for administrative proceedings, and there is no meaningful difference between MCL 324.1704(3) and MCL 324.1705(2). Regardless of how a MEPA case originates, the task for the trial court—or agency—is the same. It must adjudicate or determine whether the "conduct" at issue is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources.

2. Under MEPA, harms asserted beyond the conduct itself must be examined to determine if they are factually and proximately caused by the conduct. In this case, the PSC must apply this framework and determine whether the Replacement Project will factually and proximately cause Line 5's extended lifespan and attendant harms.

In applying MEPA, the factfinder must first define the "conduct" at issue. "Conduct" under MEPA is distinguishable from alleged environmental harms. In citizen MEPA suits, the allegations in the plaintiff's complaint define the conduct at issue. In administrative proceedings—whether initiated by an agency under MCL 324.1705(2) or remitted to an agency by the court under MCL 324.1704(2)—the subject of the proceedings is the conduct at issue under MEPA. Here, the Replacement Project for which Enbridge sought approval in its Act 16 application was the subject of the PSC proceedings.

Once the relevant "conduct" is established, MEPA requires courts and agencies to determine or adjudicate whether the conduct will cause pollution, impairment, or destruction of the air, water, or other natural resources, or the public trust in these resources. This analysis can be broken into two steps: (1) determining which harms are at issue and (2) assessing the scope of those harms. At the first step, the factfinder—aided by the parties—must determine what kind of

environmental risks the conduct in question poses. Under MCL 324.1705(1) and (2), the focus is on those harms that are likely effects of the conduct. Although this concept appears broad, MEPA's text limits its scope by requiring both factual causation (i.e., the harm is an "effect" of conduct) and proximate causation (i.e., the harm is "likely"). Proximate cause requires more than speculation or conjecture, and a mere possibility is not enough to establish either but-for causation or proximate causation. Determining the harm of the relevant conduct is a factually intensive inquiry and does not lend itself to hard-and-fast rules; courts and agencies must use common sense and apply basic proximate cause principles. A factfinder should not fully quantify the effects of a risk until it determines that the risk is a result of the proposed conduct. This analysis therefore necessitates a case-by-case inquiry that allows the courts to fashion standards in the context of actual problems as they arise in individual cases.

Once the factfinder has determined which environmental risks are actually relevant to the conduct, it must carry out its statutory duty to adjudicate or determine the impact of the defendant's conduct on the air, water, or other natural resources, and on the public trust in these resources. If the factfinder determines that the conduct at issue poses no meaningful environmental harm, the analysis ends, but if the factfinder determines that the environmental harms are the likely effects of the conduct at issue, the factfinder may not permit the conduct if a feasible and prudent alternative exists.

To accurately assess the environmental consequences of the Replacement Project, the PSC should have determined whether the project would be the proximate cause of Line 5's continued operation and its alleged attendant harms. Because it did not do so, the PSC was unable to fulfill its obligations under MEPA to determine, pursuant to MCL 324.1705(2), what pollution, impairment, or destruction of the air, water, or other natural resources, or the public trust in these resources, the project might cause; that is, the PSC erred by not examining whether the Replacement Project would be the proximate cause of further environmental harms by extending Line 5's lifespan. For purposes of the MEPA harm analysis, Line 5's continued operation, with and without the Replacement Project, was a *factual* question, not just a legal one. The PSC also acted inconsistently by considering greenhouse emissions from the pipeline as a whole in its harms analysis, but declining to consider other environmental risks (like oil spills) using that same scope.

3. Once a court or an agency finds that the conduct at issue has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources, the next step, as set forth in MCL 324.1705(2), is to determine whether there is a feasible and prudent alternative that avoids or mitigates these environmental effects. Determining the feasibility or prudence of an "alternative" necessarily calls for a benchmark against which the alternative may be evaluated. That benchmark is the harm caused by the proposed conduct. Accordingly, a meaningful examination of the alternatives cannot occur until the impact of the relevant conduct on the air, water, or other natural resources, and on the public trust in these resources, is determined. This analysis of environmental impacts is distinct from the requirements that an alternative be feasible, prudent, and consistent with the public health, safety, and welfare. Accordingly, they may be considered independently, though both bear on the factfinder's final decision. In addition, MCL 324.1705(2) requires that *both* the conduct and the alternatives be consistent with the public health, safety, and welfare. The alternatives analysis exists under MEPA to determine if there is a feasible and less environmentally harmful pathway

than the challenged conduct.  In order for this analysis to accomplish its goals, the environmental impact of the conduct at issue must be compared with that of the alternatives being considered.  An analysis that fails to do so will not allow a reasoned choice of alternatives.

The inconsistencies in the PSC's comparisons did not allow for such a "reasoned choice."  The PSC incorrectly compared the environmental effects of alternatives that would fully replace Line 5 with the effects of the Replacement Project alone.

4.  MEPA requires separate consideration of harms to public trust resources.  The correct way to define "public trust" in MEPA is by looking to the common-law public trust doctrine.  The doctrine serves to protect the waters of the Great Lakes and their submerged lands and requires consideration of the public's right to fish, hunt, travel through, and otherwise utilize the Great Lakes.  Just as the MEPA factfinder must assess and mitigate harm to the water and the air, so too must it assess and mitigate harm to public trust resources.  The PSC erred by failing to determine whether the Replacement Project would pollute, impair, or destroy public trust resources.

Court of Appeals judgment reversed, PSC order vacated, and case remanded to the PSC for further proceedings.

Justice ZAHRA, concurring in part and dissenting in part, concurred in the majority opinion limited only to the holding that the matter should be remanded to the PSC for express findings on the issue of public trust; otherwise, he disagreed with the conclusions reached in the majority opinion in several respects.  First, the majority opinion errs by concluding that appellate courts review de novo administrative decisions under MEPA.  The majority opinion does not provide the PSC's decision any degree of deference even though some level of deference is generally afforded to administrative decision-makers because of their expertise in the regulated field.  MCL 324.1705(2) plainly contemplates judicial review but does not describe the judicial review required.  However, Const 1963, art 6, § 28, requires reviewing courts to determine whether agency orders are authorized by law and supported by competent, material, and substantial evidence on the whole record.  Applying de novo review in this case allows the majority to dismiss the PSC's determinations or even substitute its own beliefs for the PSC's findings.  The majority opinion also ignores the clear differences in the text of MCL 324.1701 and MCL 324.1705 to erroneously conclude that the Legislature did not intend for the MEPA standard to differ between citizen suits and administrative proceedings.

Justice ZAHRA further disagreed with the majority opinion's expanded scope of analysis under MEPA.  The majority opinion's conclusion—that the continued operation of Line 5 is itself a relevant adverse environmental effect of the Replacement Project—is poorly reasoned and illogical, and it creates a moral hazard.  By dismissing the PSC's determination and expanding the scope of review to the entirety of Line 5, the majority opinion ignores that Line 5 has already been determined to be in the public interest, and its continued operation is the result of the authority the state granted Enbridge's predecessor to construct, use, and maintain Line 5, not the Replacement Project.  The majority opinion's interpretation of "likely" effects is particularly problematic; tenuous, remote, or peripheral environmental effects should not be considered relevant in determining feasible alternatives to the Replacement Project.  Instead, consideration of proposed feasible alternatives must be limited to alternatives to the Replacement Project, not alternatives to

Line 5 as a whole.  While the PSC erroneously considered feasible alternatives to the entirety of Line 5, the PSC did properly consider feasible alternatives to the Replacement Project.

Finally, while the PSC did not expressly consider the public trust in its final opinion, necessitating remand on that issue, the opinion clearly addressed the substance of the public trust in the state's natural resources.  Justice ZAHRA additionally noted that the Department of Environment, Great Lakes, and Energy recently granted a permit to Enbridge for the Replacement Project, in which proceedings the public trust was expressly considered; this could aid the PSC in independently addressing the public trust on remand.

# OPINION

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

FILED July 31, 2026

STATE OF MICHIGAN

SUPREME COURT

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

LITTLE TRAVERSE BAY BANDS OF
ODAWA INDIANS,

        Appellant,

v                                      No. 168335

MICHIGAN PUBLIC SERVICE
COMMISSION, MACKINAC STRAITS
CORRIDOR AUTHORITY, MICHIGAN
PROPANE GAS ASSOCIATION, NATIONAL
PROPANE GAS ASSOCIATION, and
MICHIGAN LABORERS' DISTRICT
COUNCIL,

        Appellees,

and

ENBRIDGE ENERGY LIMITED
PARTNERSHIP,

        Petitioner-Appellee.

---

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

---

BAY MILLS INDIAN COMMUNITY,

        Appellant,

v                                     No. 168336

MICHIGAN PUBLIC SERVICE
COMMISSION, MACKINAC STRAITS
CORRIDOR AUTHORITY, MICHIGAN
PROPANE GAS ASSOCIATION, NATIONAL
PROPANE GAS ASSOCIATION, and
MICHIGAN LABORERS' DISTRICT
COUNCIL,

        Appellees,

and

ENBRIDGE ENERGY LIMITED
PARTNERSHIP,

        Petitioner-Appellee.

---

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

---

GRAND TRAVERSE BAND OF OTTAWA
AND CHIPPEWA INDIANS,

        Appellant,

v                                     No. 168337

MICHIGAN PUBLIC SERVICE
COMMISSION, MACKINAC STRAITS
CORRIDOR AUTHORITY, MICHIGAN
PROPANE GAS ASSOCIATION, NATIONAL
PROPANE GAS ASSOCIATION, and
MICHIGAN LABORERS' DISTRICT
COUNCIL,

        Appellees,

and

ENBRIDGE ENERGY LIMITED
PARTNERSHIP,

        Petitioner-Appellee.

_____

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

_____

NOTTAWASEPPI HURON BAND OF THE
POTAWATOMI,

        Appellant,

v                                        No. 168338

MICHIGAN PUBLIC SERVICE
COMMISSION, MACKINAC STRAITS
CORRIDOR AUTHORITY, MICHIGAN
PROPANE GAS ASSOCIATION, NATIONAL
PROPANE GAS ASSOCIATION, and
MICHIGAN LABORERS' DISTRICT
COUNCIL,

        Appellees,

and

ENBRIDGE ENERGY LIMITED
PARTNERSHIP,

        Petitioner-Appellee.

---

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

---

ENVIRONMENTAL LAW & POLICY
CENTER and MICHIGAN CLIMATE ACTION
NETWORK,

        Appellants,

v

No. 168339

MICHIGAN PUBLIC SERVICE
COMMISSION, MACKINAC STRAITS
CORRIDOR AUTHORITY, MICHIGAN
PROPANE GAS ASSOCIATION, NATIONAL
PROPANE GAS ASSOCIATION, and
MICHIGAN LABORERS' DISTRICT
COUNCIL,

        Appellees,

and

ENBRIDGE ENERGY LIMITED
PARTNERSHIP,

        Petitioner-Appellee.

---

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

---

FOR LOVE OF WATER,

        Appellant,

v                                        No. 168346

MICHIGAN PUBLIC SERVICE
COMMISSION, MACKINAC STRAITS
CORRIDOR AUTHORITY, MICHIGAN
PROPANE GAS ASSOCIATION, NATIONAL
PROPANE GAS ASSOCIATION, and
MICHIGAN LABORERS' DISTRICT
COUNCIL,

        Appellees,

and

ENBRIDGE ENERGY LIMITED
PARTNERSHIP,

        Petitioner-Appellee.

---

BEFORE THE ENTIRE BENCH

WELCH, J.

These cases are about the intersection of the Great Lakes, energy transmission, and administrative review. In particular, they concern the order of the Michigan Public Service Commission (PSC) approving appellee Enbridge Energy Limited Partnership's application to construct a tunnel under the Straits of Mackinac to house a portion of its Line 5 pipeline (the "Replacement Project"). Appellants—environmental advocacy groups and Indian Tribes—contend that the PSC erred in its analysis of the project's environmental effects under the Michigan environmental protection act (MEPA).[1]

---

[1] MCL 324.1701 through MCL 324.1706 (Part 17 of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq*.). While MEPA was

5

We take this opportunity to answer several questions about MEPA's scope and function. First, we hold that courts must review de novo an agency's application of MEPA, regardless of whether a case commences in court or in administrative proceedings. Second, we hold that MEPA requires (1) consideration of the environmental impact factually and proximately caused by the conduct at issue, (2) a fair and reasoned comparison of the environmental impacts of any alternatives to the conduct considered, and (3) consideration of the conduct's potential effects on public trust resources. Applying these holdings to the cases at issue, we conclude that the Court of Appeals erred by applying a deferential standard of review to the PSC's decision, and that the PSC erred by (1) failing to consider whether the tunnel project will factually and proximately cause the extension of Line 5's operational life, potentially resulting in additional environmental harm; (2) comparing alternatives in an inconsistent manner; and (3) failing to consider the project's impact on public trust resources.

Accordingly, we reverse the judgment of the Court of Appeals, vacate the PSC's order approving the construction of the Replacement Project, and remand this matter to the PSC for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND

The Great Lakes are the largest freshwater system on Earth. Department of Environment, Great Lakes, and Energy, *Learn About our Great Lakes* <https://www.michigan.gov/egle/public/learn/great-lakes> (accessed June 12, 2026)

---

originally enacted as a standalone statute, see 1970 PA 127, it was later recodified—in essentially the same form—as part of NREPA, see 1994 PA 451. For simplicity, we use the current citations for MEPA's provisions throughout this opinion.

6

[https://perma.cc/7AJU-ZJKS].  "[T]he pure blue waters of these incomparable inland seas" are "Michigan's great natural resource[.]"  *Obrecht v Nat'l Gypsum Co*, 361 Mich 399, 416; 105 NW2d 143 (1960).  Connecting Lake Michigan and Lake Huron, the Straits of Mackinac are a critical point in this ecosystem.  As the many Indian Tribes involved in this litigation point out, the Great Lakes and the Straits of Mackinac have nourished life in this region for thousands of years.  See generally *United States v Michigan*, 471 F Supp 192, 221-225 (WD Mich, 1979) (discussing the importance of fishing to the native inhabitants of Michigan in the context of a landmark decision enforcing tribal treaty fishing rights).  The Straits, spanned by the Mackinac Bridge, are a significant natural and commercial resource for the state and a point of pride for Michiganders.

## A.  LINE 5's HISTORY

The Line 5 pipeline, operated by Enbridge, is 645 miles long and carries oil and liquid natural gas (LNG) from Superior, Wisconsin, to Sarnia, Ontario.  It is part of a larger network of Enbridge pipelines stretching across the United States and Canada.  Although Line 5 mostly transports hydrocarbons across Michigan to eastern Canada, the line provides crude oil to a few smaller facilities in Michigan, provides most of the Upper Peninsula's propane supply, and provides jet fuel to the Detroit Metropolitan Wayne County Airport.

In 1953, Enbridge's predecessor—Lakehead Pipe Line Company, Inc. (Lakehead)—received approval from the PSC to construct the pipeline presently known as

Line 5.  The Michigan Conservation Commission[2] also granted Lakehead an easement to construct two 20-inch pipes (referred to as the dual pipelines) located on or suspended above the lakebed across the Mackinac Straits.

This Court rejected a collateral attack on the PSC's decision in *Lakehead Pipe Line Co, Inc v Dehn*, 340 Mich 25; 64 NW2d 903 (1954).  In that case, landowners challenging the condemnation of their land along the pipeline's path argued "that the construction and operation of the pipe line in question here is not a purpose for which the State may grant the power of eminent domain," as Lakehead primarily contemplated "the transporting of oil from Canadian oil fields to refineries in" Canada.  *Id*. at 36.  The Court rejected their argument, noting that Lakehead "propose[d] to deliver oil to Michigan refineries and other purchasers in this State" and holding that "the construction, maintenance and operation of the pipe line in question" would "benefit[] the people of Michigan."  *Id*. at 36, 38.[3]

Appellants allege that the dual pipelines, which have a daily carrying capacity of up to 540,000 barrels and are elevated above the lakebed by supports, are vulnerable to damage.  Anchor strikes are a particular concern, as exemplified by an April 2018 strike that dented, but did not rupture, the dual pipelines.[4]  Given the fast-moving currents and

---

[2]  The Conservation Commission was the predecessor to the Natural Resources Commission.  See *Westervelt v Natural Resources Comm*, 402 Mich 412, 418 n 1; 263 NW2d 564 (1978) (opinion by WILLIAMS, J.).

[3] Notably, the pipeline's approval, construction, and attendant litigation all preceded the adoption in 1963 of Michigan Constitution, Article 4, § 52—which requires the Legislature to "provide for the protection of the air, water and other natural resources of the state"— and the enactment of MEPA in 1970, 1970 PA 127.

[4] See National Transportation Safety Board, *Marine Accident Brief—Anchor Contact of Articulated Tug and Barge* Clyde S VanEnkevort/Erie Trader *with Underwater Cables and Pipelines* (May 21, 2019), p 7, available at

connection of both Lake Michigan and Lake Huron to the Straits, if one of the pipes were to rupture, the resulting spill would be environmentally and economically catastrophic.

## B. THE REPLACEMENT PROJECT

The "Replacement Project" at issue here emerged as a result of a series of agreements negotiated between Enbridge and Governor Rick Snyder on behalf of the state of Michigan in 2017 through 2018. Specifically, the project involves drilling and constructing a new, concrete-lined tunnel through the bedrock approximately 60 feet to 250 feet under the Straits' lakebed and running a new 30-inch pipe through that tunnel. According to the terms of Enbridge's agreement with the state, this would allow the dual pipelines to be decommissioned and "would essentially eliminate the risk of adverse impacts that may result from a potential oil spill in the Straits . . . ." The project would not change Line 5's current carrying capacity or the service it provides. Initially, the project contemplated that the tunnel could be used for other utilities, such as electric and broadband lines. However, the PSC declined to approve this aspect of the project, concluding that "Enbridge failed to demonstrate by a preponderance of the evidence that co-locating third-party utilities in the tunnel with the Straits Line 5 replacement segment is reasonable or safe."

In 2018, the Legislature created the Mackinac Straits Corridor Authority (MSCA) and authorized it to enter into an agreement to build a "utility tunnel" under the Straits. See 2018 PA 359. Enbridge agreed to construct and maintain the tunnel and the

<https://www.ntsb.gov/investigations/AccidentReports/Reports/MAB1912.pdf> (accessed June 12, 2026) [https://perma.cc/5DAW-95YV].

9

replacement pipeline and to deactivate the existing dual pipelines once the Replacement Project becomes operational. For its part, the MSCA agreed to obtain the necessary property rights for Enbridge to construct the Replacement Project. Consistent with this goal, in December 2018, the Department of Natural Resources (DNR) granted the MSCA an easement to construct a tunnel under the Straits. Once Enbridge completes the tunnel, the MSCA will then take ownership of the tunnel and provide Enbridge with a 99-year lease.

Enbridge filed an application with the PSC to move forward with the construction. As set forth in more detail below, the PSC approved the application and the Court of Appeals affirmed that decision, resulting in this appeal.

## II. LEGAL BACKGROUND

Some initial legal background is helpful for understanding the proceedings that led to this appeal and the positions the parties have taken. Three legal frameworks intersect in this case: 1929 PA 16 (Act 16), MEPA, and the common-law public trust doctrine.

## A. ACT 16

We begin with 1929 PA 16 (Act 16), codified at MCL 483.1 *et seq.*, which gives the PSC primary authority to regulate pipelines in this state. Under this framework, pipeline operators must apply to and receive approval from the PSC in order to construct new facilities. See MCL 483.3(1)(a); Mich Admin Code, R 792.10447(1)(c). The PSC has set out a three-part test for determining whether to grant an application under Act 16. It must find that "(1) the applicant has demonstrated a public need for the proposed pipeline, (2) the proposed pipeline is designed and routed in a reasonable manner, and (3)

10

the construction of the pipeline will meet or exceed current safety and engineering standards." *In re Application of Enbridge Energy, Ltd Partnership*, order of the Public Service Commission, entered January 31, 2013 (Case No. U-17020), p 5. See also *In re Application of Wolverine Pipe Line Co*, order of the Public Service Commission, entered July 23, 2002 (Case No. U-13225), pp 4-5.

Any party in interest who is "dissatisfied with any order of the [PSC] fixing any rate or rates, fares, charges, classifications, joint rate or rates, or any order fixing any regulations, practices, or services, may . . . file an appeal as of right in the Court of Appeals." MCL 462.26(1). The party appealing from such an order must "show by clear and satisfactory evidence that the order of the [PSC] complained of is unlawful or unreasonable." MCL 462.26(8). See also *In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999) (describing the deferential standards of review for certain PSC decisions).

## B. MEPA

We next turn to the environmental protections guaranteed by our state Constitution and by statute. Article 4, § 52 of the Michigan Constitution of 1963 reads:

> The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction.

Michigan's Environmental Protection Act, 1970 PA 127, "mark[ed] the Legislature's response to [that] constitutional commitment . . . ." *Ray v Mason Co Drain Comm'r*, 393 Mich 294, 304; 224 NW2d 883 (1975). MEPA "imposes a duty on individuals and

11

organizations both in the public and private sectors to prevent or minimize degradation of the environment which is caused or is likely to be caused by their activities." *Id*. at 306. It "prohibits pollution, destruction, or impairment of the environment unless it can be shown that 'there is no feasible and prudent alternative' and that [a] defendant's conduct 'is consistent with the promotion of the public health, safety and welfare in light of the state's paramount concern for the protection of its natural resources . . . .' " *Id*. (citation omitted; ellipsis in *Ray*). Put simply, MEPA bars environmentally destructive conduct unless it can be shown that the conduct is necessary and unavoidable.[5]

MEPA "was the first legislation of its kind" and a "dramatic change" from prior practice in environmental protection, which vested environmental enforcement in administrative agencies without citizen participation. *Id*. at 304-305. Its provisions reflected "public dissatisfaction with the existing legal and regulatory regime." Castrilli, *Environmental Rights Statutes in the United States and Canada: Comparing the Michigan and Ontario Experiences*, 9 Vill Env't LJ 349, 361 (1998). The belief that administrative agencies were "too closely associated" with regulated interests and were unlikely to provide relief motivated the decision to vest enforcement in MEPA's citizen intervention and lawsuit provisions. *Id*.; see also *Ray*, 393 Mich at 305 ("Not every public agency proved to be diligent and dedicated defenders of the environment.").

---

[5] MEPA differs significantly from its federal analogue, the National Environmental Policy Act (NEPA), 42 USC 4321 *et seq*. Unlike MEPA, "NEPA is a purely procedural statute" and "imposes no substantive environmental obligations or restrictions." *Seven Co Infrastructure Coalition v Eagle Co, Colorado*, 605 US 168, 173; 145 S Ct 1497; 221 L Ed 2d 820 (2025). But, as will be discussed later in this opinion, notwithstanding their differences, MEPA and NEPA have some analogous provisions.

The Legislature did not attempt to promulgate a specific set of substantive environmental standards within MEPA, nor did it assign this task to an administrative agency. See *id*. at 306. Instead, the Legislature set "parameters" but "left to the courts the important task of giving substance to the standard by developing a common law of environmental quality." *Id*. Although the statute contemplates that courts may adopt standards or procedures created by "the state or an instrumentality, agency, or political subdivision," courts "may . . . [d]etermine the validity, applicability, and reasonableness" of any such standard, and "[i]f a court finds a standard to be deficient, direct the adoption of a standard approved and specified by the court." MCL 324.1701(2)(a) and (b). See also *Nemeth v Abonmarche Dev, Inc*, 457 Mich 16, 30; 576 NW2d 641 (1998).

Against this backdrop, MEPA provides several procedural pathways to enforce its requirements. Most notably, it creates a cause of action for private parties—and the attorney general—to seek declaratory and equitable relief in circuit court. See MCL 324.1701(1); see also MCL 324.1702 through MCL 324.1704. But, in addition to allowing "citizen suits,"[6] MEPA contemplates that agencies will also enforce its provisions. Section 1704 creates a mechanism for the circuit court to remit a MEPA action to an administrative agency for a decision in the first instance. MCL 324.1704(2) through (4). MEPA also

---

[6] Lawsuits brought under MEPA by individuals or other entities have commonly been referred to as "citizen suits," see, e.g., Sax & DiMento, *Environmental Citizen Suits: Three Years' Experience Under the Michigan Environmental Protection Act*, 4 Ecology LQ 1 (1974), even though MEPA's text uses the term "person," see, e.g., MCL 324.1701(1); MCL 324.1705(1). "Person" is broadly defined as "an individual, partnership, corporation, association, governmental entity, or other legal entity." MCL 324.301(h). Since MEPA's enactment, it has been understood that the act empowers "private individuals and other legal entities with standing" to enforce its provisions. *Ray*, 393 Mich at 305.

13

allows the attorney general or "any other person" to intervene in these judicial and administrative proceedings. MCL 324.1705(1). Additionally, and most relevant here, § 1705 directs administrative agencies to apply MEPA in their own proceedings. MCL 324.1705(2) ("In administrative, licensing, or other proceedings, and in any judicial review of such a proceeding, the alleged pollution, impairment, or destruction of the air, water, or other natural resources, or the public trust in these resources, shall be determined[.]"). See also *Buggs v Mich Pub Serv Comm*, unpublished per curiam opinion of the Court of Appeals, issued January 13, 2015 (Docket No. 315058), p 9 (concluding that the PSC is required to follow MEPA).

MEPA gives the circuit court the power, and the responsibility, to review the agency's decision independently, *West Mich Environmental Action Council v Natural Resources Comm*, 405 Mich 741, 753; 275 NW2d 538 (1979) (*WMEAC*), including the ability to take additional evidence, MCL 324.1704(3). This "runs counter to the usual theme of deference to the expertise of administrative agencies[.]" Selmi & Manaster, 1 State Environmental Law (December 2025 update), § 16.53, p 1102. See also MCL 24.306(1); Const 1963, art 6, § 28 (setting out the generally applicable standards of review for agency decisions).

Whether MEPA is being applied by a court in a citizen suit or by an agency in permitting proceedings, the analytical framework is the same.[7] MCL 324.1703(1) sets out how MEPA applies in the context of citizen suits. The statute provides, in part:

---

[7] There are, however, differences between these provisions. For instance, a person bringing an action in the circuit court has the initial burden to show that the conduct at issue has harmed or is likely to harm the environment, MCL 324.1703(1), whereas MCL

14

When the plaintiff in the action has made a prima facie showing that the conduct of the defendant has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also show, by way of an affirmative defense, that there is no feasible and prudent alternative to defendant's conduct and that his or her conduct is consistent with the promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment, or destruction. [MCL 324.1703(1).]

MCL 324.1705(2), the provision governing administrative actions, uses similar language:

In administrative, licensing, or other proceedings, and in any judicial review of such a proceeding, the alleged pollution, impairment, or destruction of the air, water, or other natural resources, or the public trust in these resources, shall be determined, and conduct shall not be authorized or approved that has or is likely to have such an effect if there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety, and welfare.

Thus, there are two main steps to analyze under MEPA. First, the factfinder must determine "the alleged pollution, impairment, or destruction of the air, water, or other natural resources, or the public trust in these resources," MCL 324.1705(2), and whether the "conduct" in question "has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources," MCL 324.1703(1). See also MCL 324.1701(1); MCL 324.1704(2) and (3) (using analogous language). Second, even if environmental harm would result, the factfinder may still permit the conduct if the defendant shows "that there is no feasible and prudent alternative to [the] conduct and that [the] conduct is consistent with the promotion

_____

324.1705(2) requires an agency to determine whether the conduct harms or is likely to harm the environment in the first instance in cases of administrative review.

15

of the public health, safety, and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment, or destruction." MCL 324.1703(1). See also MCL 324.1705(2). Enbridge's "conduct," the "alleged pollution, impairment, or destruction" of (or harm to) natural resources from the Replacement Project, and any "alternatives" to the Replacement Project are all at issue in this case.

## C. PUBLIC TRUST

Beyond constitutional and statutory protections, Michigan's common law obligates "the state, as sovereign, . . . to protect and preserve the waters of the Great Lakes and the lands beneath them for the public. The state serves, in effect, as the trustee of public rights in the Great Lakes for fishing, hunting, and boating for commerce or pleasure." *Glass v Goeckel*, 473 Mich 667, 678-679; 703 NW2d 58 (2005). In *Glass*, we traced the origins of the public trust doctrine back to *The Institutes of Justinian*.[8] *Id*. at 677. We need not repeat all that history here—suffice it to say that the doctrine has been an established part of Michigan law for well over a century. See *id*. at 678 (collecting cases).

Throughout this history, we have held that the state cannot abandon its duties under the public trust doctrine "any more than it can abdicate the police power or other essential power of government." *Nedtweg v Wallace*, 237 Mich 14, 17; 208 NW 51 (1926). Accordingly, even when private parties hold title to Great Lakes bottomlands and lakefront property, they do so "*subject to the public trust*." *Glass*, 473 Mich at 679. The state retains

---

[8] *The Institutes of Justinian* was a "compendium of principles of Roman law" commissioned by the sixth-century Byzantine emperor Justinian I. Lazarus, *Changing Conceptions of Property and Sovereignty in Natural Resources: Questioning the Public Trust Doctrine*, 71 Iowa L Rev 631, 633-634 (1986).

the authority to regulate private conduct in order to preserve public trust resources. *Id*. at 681; *Obrecht*, 361 Mich at 413; *People v Silberwood*, 110 Mich 103, 107-109; 67 NW 1087 (1896); *Lincoln v Davis*, 53 Mich 375, 388-389; 19 NW 103 (1884).

## III. PROCEDURAL HISTORY

Having set forth the applicable law, we now return to the proceedings pertinent to this appeal. The Replacement Project and Line 5's continued operation have been the subject of extensive litigation, regulatory proceedings, and executive action—parts of which have reached the United States Supreme Court. See *Enbridge Energy, Ltd Partnership v Whitmer*, 813 F Supp 3d 777, 787-792 (WD Mich, 2025) (providing an overview of Enbridge's recent litigation against Michigan); *Enbridge Energy, LP v Nessel*, 608 US ___; 146 S Ct 1074; ___ L Ed 2d ___ (2026).[9] This case, however, concerns only

---

[9] Both the Attorney General and the Governor have sued Enbridge in attempts to revoke the 1953 easement to operate the dual pipelines. See *Enbridge*, 813 F Supp 3d at 790-791. The Governor dismissed her suit after it was removed to federal court. See *id*. at 790; *Michigan v Enbridge Energy, Ltd Partnership*, 571 F Supp 3d 851 (WD Mich, 2021). Enbridge attempted to remove the Attorney General's suit to federal court as well, but the United States Supreme Court recently concluded that its attempt was untimely, allowing the case to proceed in Ingham Circuit Court. *Nessel v Enbridge Energy, LP*, 104 F4th 958 (CA 6, 2024); *Enbridge*, 608 US at ___; 146 S Ct at 1086. For its part, Enbridge sued the Governor, arguing that her attempt to revoke the 1953 easement was preempted by federal law. See *Enbridge*, 813 F Supp 3d at 791-792. The federal district court ruled in Enbridge's favor, *id*. at 810, though its decision is pending on appeal.

In an unrelated case, a federal district court in Wisconsin issued an injunction that ordered Enbridge to cease operating Line 5 within certain Tribal lands. The injunction was stayed pending appeal. See *Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v Enbridge Energy Co, Inc*, unpublished opinion of the United States District Court for the Western District of Wisconsin, issued June 16, 2023 (Case No. 19-cv-602-wmc); *Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v Enbridge Energy Co, Inc*, unpublished opinion of the United States District Court for the Western District of Wisconsin, issued February 27, 2026 (Case No. 19-cv-602-wmc). The United States Court of Appeals for the Seventh

17

Enbridge's application under Act 16 to construct the Replacement Project.[10]  A summary of the relevant proceedings follows.

### A. PSC PROCEEDINGS

### 1. INITIAL PROCEEDINGS AND MOTION IN LIMINE

Enbridge filed an application with the PSC in 2020 under Act 16 to "Replace and Relocate the Segment of Line 5 Crossing the Straits of Mackinac into a Tunnel Beneath the Straits of Mackinac[.]"  Numerous parties, including appellants, Bay Mills Indian Community (Bay Mills), Grand Traverse Band of Ottawa and Chippewa Indians, Little Traverse Bay Bands of Odawa Indians, Nottawaseppi Huron Band of the Potawatomi, Environmental Law and Policy Center (ELPC), Michigan Climate Action Network

---

Circuit affirmed the district court's conclusions, but remanded the matter to the district court with instructions to fashion an injunction that would allow Enbridge to reroute the pipeline around the Tribal lands without halting operations.  See *Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v Enbridge Energy Co, Inc*, ___ F4th ___, ___ (CA 7, July 30, 2026) (Docket Nos. 23-2309 and 23-2467); slip op at 43-44.

[10] In addition to its Act 16 application, Enbridge applied to the Department of Environment, Great Lakes, and Energy (EGLE) for several permits required by other provisions of NREPA.  See generally Department of Environment, Great Lakes, and Energy, *Line 5: Applicable Permits*, available at <https://www.michigan.gov/egle/about/featured/line5/permits> (accessed July 21, 2026).  Shortly before this opinion was published, EGLE issued Enbridge a draft permit to construct the Replacement Project, subject to certain conditions, including the creation of an approved cultural-resources mitigation plan.  See Department of Environment, Great Lakes, and Energy, *Draft Permit for Countersignature* <https://www.michigan.gov/egle/-/media/Project/Websites/egle/Documents/Multi-Division/Line-5/2026/2026-07-15-EGLE-Line5-Permit-Countersignature.pdf?rev=162663a2cb7d4db9bc3394a1ed3419f9&hash=F070CC2BE565BA4DC9020F253FFA3296> (accessed July 21, 2026).

(MCAN), and For Love of Water (FLOW),[11] intervened in the proceedings to oppose the Replacement Project. Appellees Michigan Laborers' District Council, Michigan Propane Gas Association, and National Propane Gas Association intervened to support the project.

From the beginning, the parties have disputed the proper scope of the PSC's MEPA analysis in this case. At the most basic level, Enbridge argues that the PSC's consideration of the proposal should be limited to the Replacement Project tunnel. It claims that the rest of the pipeline's length and the products that run through it are irrelevant because Line 5 will continue to operate whether the tunnel is built or not. By contrast, appellants argue that the PSC must look beyond the tunnel itself and consider the continued operation of Line 5 as a whole to fulfill its obligations under MEPA.

After Enbridge filed its application, the PSC referred the matter to an administrative law judge (ALJ) to conduct proceedings and build a record. See Mich Admin Code, R 792.10415(2); Mich Admin Code, R 792.10433. However, the PSC also decided that it would "read the record" and render a decision on Enbridge's application itself, rather than waiting for the ALJ to issue a proposed decision. At the outset, Enbridge filed a motion in limine seeking to exclude as legally irrelevant various issues from the PSC's consideration of the Replacement Project. These issues were: "(1) the construction of the utility tunnel, (2) the environmental impact of the tunnel construction, (3) the public need for and continued operation of Line 5, (4) the current operational safety of Line 5, (5) whether Line 5 has an adverse impact on climate change, and (6) the intervening parties' climate change

---

[11] We refer to all these intervenors collectively as "appellants." When we wish to refer specifically to the appellants in Docket Nos. 168335 through 168339, we use "Bay Mills appellants." We refer to FLOW—the sole appellant in No. 168346—simply as "FLOW."

19

agendas." The ALJ ruled against Enbridge on the first point, concluding that the tunnel fell within the scope of the PSC's Act 16 analysis, but otherwise granted the motion.

Several intervenors—including some of the appellants here—appealed the ALJ's ruling to the PSC itself. While that appeal was pending, Governor Gretchen Whitmer issued a notice of revocation of the 1953 easement granting Enbridge permission to operate the dual pipelines across the Straits of Mackinac.[12] The PSC, as a result, remanded the case to the ALJ to consider the impact of the Governor's actions.

On remand, the ALJ reached the same conclusions as he had before. He found that the PSC's 1953 order had already established that Line 5 served a public need and that this finding had no expiration date. Specifically, he noted that "a reexamination of the public need of Line 5 under Act 16, along with its operational and safety aspects, would result in a diminishment of [an] existing license under [MCL 24.292(1) of the Administrative Procedures Act (APA), MCL 24.201 *et seq*.] without providing the procedural due process protections afforded a licensee." He also noted that the PSC had yet to take any action to revoke Enbridge's license to operate Line 5. As to the Governor's more recent actions, the ALJ concluded that they did not affect Enbridge's right to operate the rest of the pipeline:

> The [PSC's] jurisdiction under Act 16 is over the proposal to relocate the existing pipelines into the Utility Tunnel, and a component of that jurisdiction is examining the environmental impacts of that conduct, consistent with the judicial and [PSC] construction of that term, under MEPA. The issuance of the Notice does not expand the MEPA inquiry to include the environmental effects of the operation and safety of Line 5, or

---

[12] As previously noted, see note 9 of this opinion, the validity of the Governor's action has been the subject of extensive litigation. See *Enbridge Energy, Ltd Partnership*, 813 F Supp 3d at 788-792.

20

those arising from the production, refinement, and consumption of the oil transported on Line 5.

Accordingly, the ALJ concluded that Governor Whitmer's actions could not "be used to expand the scope of this case to include an examination or determination of the public need for Line 5, or any aspect of its operation and safety."

The intervenors appealed to the PSC again, which largely affirmed the ALJ's ruling in an April 2021 order. Like the ALJ, the PSC determined that its 1953 decision approving Line 5, as well as this Court's decision in *Lakehead*, established that the pipeline complied with Act 16 and that there was no expiration date for this finding. Accordingly, it concluded that the Act 16 analysis in this case should be limited to the Replacement Project—and not the pipeline as a whole. The PSC also noted that this was consistent with its practice in past Act 16 cases, citing the July 23, 2002 order in *In re Application of Wolverine Pipe Line Co* and the January 31, 2013 order in *In re Application of Enbridge Energy*.

The PSC applied similar reasoning to its MEPA analysis, stating that "the application of MEPA is limited to *the conduct at issue in this case*" (emphasis added)— i.e., to the Replacement Project. Accordingly, it refused to consider evidence of "potential pollution, impairment, and destruction of Michigan's natural resources resulting from existing sections of Line 5"—the most notable of which was the danger of oil spills. It also concluded that its MEPA analysis did "not extend to the entirety of Line 5, including the 641 miles of Line 5 outside of the Replacement Project," but was limited to the new single pipeline and tunnel.

21

However, the PSC also determined that the conduct at issue included the products flowing through the new pipeline section and allowed some of the appellants to introduce evidence of the greenhouse gas emissions that would result from the consumption of the products. Noting that "the Legislature intended for Act 16 to cover not just the construction of pipelines for the sake of building pipelines," the PSC reasoned that the pipeline's "purpose and the products flowing through them were inherently part of the regulatory framework established in Act 16." The PSC also concluded that greenhouse gases were "pollution" within the meaning of MEPA. Taking these conclusions together, it stated that although "the project under consideration is limited to the 4-mile section of the pipeline described in the application, this pipeline section would involve hydrocarbons that may result in [greenhouse gas] pollution that must be subject to MEPA review."

## 2. THE PSC'S FINAL DECISION

After the presentation of additional evidence and testimony, the ALJ closed the record and transferred the case to the PSC for a final decision. In December 2023, the PSC issued an order granting Enbridge approval under Act 16 to construct the Replacement Project. It found that the requirements of both Act 16 and MEPA were satisfied. It also declined to consider the public trust doctrine in its analysis.

First, the PSC concluded that the project met the requirements of Act 16. The PSC reasoned that a public need for the project existed because of "the ongoing reliance on the current capacity of the dual pipelines[.]" It also noted that, if the dual pipelines shut down due to damage or safety concerns, it would "require higher-risk and costlier alternative fuel

22

supply sources and transportation to Michigan customers than what is proposed in the Replacement Project."

The PSC also pointed out in its Act 16 analysis that the current pipelines were at risk of causing a spill and that Enbridge's proposed replacement—the tunnel—would alleviate that risk. It found that Enbridge's plan was superior to any of the proposed alternatives, which either were infeasible, presented additional risk of spillage, or had other issues. It also concluded that the project was designed and routed in a reasonable manner, and that it would meet or exceed current safety and engineering standards. The PSC rejected appellant FLOW's argument that it was required to consider the public trust doctrine in its Act 16 analysis, stating that consideration of public trust was the responsibility of the DNR, as it was the agency that granted Enbridge's easement.

Next the PSC turned to the required MEPA analysis. It accepted that the project would cause some pollution and environmental impairments but determined that there was no feasible or prudent alternative. See MCL 324.1705(2). First, the PSC noted that "several potential environmental impairments resulting from the construction of the Replacement Project fall in the regulatory purview of other state and federal agencies and will be addressed by separate permitting decisions." It also identified several results of the construction process that constituted environmental impairments and which were not adequately addressed by Enbridge, including increased noise, dust/particulates, light from construction, and impacts to surface water, local residents, flora, fauna, air quality, groundwater, surface soils, and vegetation. The PSC also acknowledged that the construction of the replacement pipeline would cause additional greenhouse gas emissions.

23

As required by MEPA, the PSC then considered a number of alternatives to the Replacement Project as suggested by intervenors, the MSCA, and its own staff, but concluded that none were feasible or prudent. These alternatives included[13] shipping oil and LNG by truck or train, a different pipeline route, or a different method of constructing the tunnel. Notably, in accordance with its ruling granting Enbridge's motion in limine, the PSC did *not* consider the risk of spills from *existing* sections of the Line 5 pipeline beyond the Straits segment despite considering the danger of oil spills posed by several of the alternatives, such as truck or train transportation.

The PSC concluded that simply shutting down Line 5 would not alter the demand for oil or reduce total greenhouse gas emissions, rejecting the views of appellants'

---

[13] Appellants ELPC and MCAN directed the PSC's attention to the 2017 *Alternatives Analysis for the Straits Pipelines* report by Dynamic Risk Assessment Systems, Inc., commissioned by the state of Michigan to examine alternatives to the dual pipelines. Dynamic Risk considered the following alternatives: (1) a new pipeline that does not cross the Great Lakes; (2) use of existing pipeline infrastructure that does not cross the Great Lakes; (3) decommissioning Line 5 and using rail, trucks, or barges to transport Line 5 products from Wisconsin to Canada without the products crossing the Straits; (4) using a pipeline in a trench or "sealed annulus tunnel" to cross the Straits; (5) continued operation of the dual pipelines; and (6) using alternative transportation such as rail or trucks to transport Line 5 products across the Straits if the dual pipelines were shut down.

Additionally, the MSCA proposed the additional alternatives of (1) suspending a replacement-pipe segment from the Mackinac Bridge or (2) suspending a replacement pipe from a new suspension bridge.

The PSC's own staff considered the alternatives of (1) taking no action and allowing the dual pipelines to continue to be used, (2) using an "Open-Cut Alternative" for a pipeline, (3) using a "horizontal directionally drilled" method to install a pipeline across or under the Straits, (4) protecting the existing dual pipelines with rock armoring, (5) using alternative transportation for Line 5 products "in a hypothetical post-Line 5 shutdown scenario," and (6) using alternative products from those transported by Line 5.

witnesses and agreeing with Enbridge's. And it suggested that some of the proposed alternatives—like shipping oil by truck or train—would increase emissions in the short term. The PSC also concluded that the status quo was untenable, noting that the current dual pipelines had several "near misses" in the preceding years and that a rupture would be catastrophic for the Great Lakes. Accordingly, it determined that the "no action" alternative of leaving the dual pipelines in place was not " 'consistent with the reasonable requirements of the public health, safety, and welfare.' " (Quoting MCL 324.1705(2).)

Based on its conclusion that there were no feasible or prudent alternatives to the Replacement Project, the PSC approved Enbridge's application, "conditioned upon the company obtaining the required governmental permits and approvals."[14]

## B. COURT OF APPEALS

Two groups of intervenors—the appellants here—appealed the PSC's ruling to the Court of Appeals, see MCL 462.26(1), which affirmed in a published, per curiam opinion, *In re Application of Enbridge Energy to Replace & Relocate Line 5*, ___ Mich App___; ___ NW3d ___ (February 19, 2025) (Docket Nos. 369156, 369157, 369159, 369161, 369162, 369163, 369165, and 369231).

The panel's first task was to determine the applicable standard of review. The Court acknowledged that our decision in *WMEAC* "referred to de novo review in MEPA cases," but correctly noted that "[t]his was stated in the context of 'an environmental protection act case . . . filed in a circuit court.' " *Id*. at ___; slip op at 23, quoting *WMEAC*, 405 Mich

___

[14] The PSC also required Enbridge to create a risk-management plan for the construction of the tunnel and to implement certain welding procedures. Neither of these requirements is at issue here.

at 754 (alteration in *In re Application of Enbridge Energy to Replace & Relocate Line 5*). It suggested that although the independent review contemplated by *WMEAC* was appropriate in a trial court, "[t]he Court of Appeals, of course, serves a different role from that of a circuit court and is not a finder of fact[.]" *Id*. at ___; slip op at 23. Referring to *WMEAC*'s statement that "the Legislature specifically addressed the relationship between suits brought under the environmental protection act and administrative proceedings," the Court of Appeals concluded that "[i]n this case, there was no 'suit' under MEPA" and that "[g]iven all the circumstances, including that judicial review of PSC decisions is set forth by way of statute, we conclude that the standards of review [for a PSC order] are applicable." *Id*. at ___; slip op at 23 (quotation marks and citation omitted). Accordingly, the Court of Appeals applied the deferential standard of review set out in MCL 462.26(8), rather than reviewing de novo the PSC's MEPA analysis. *Id*. at ___, ___; slip op at 18, 23.

The panel then turned to the substance of the PSC's MEPA analysis. It rejected the Bay Mills appellants' claim that the PSC erred by failing to consider the risk of oil spills along the entirety of Line 5 because the Replacement Project was the only " 'conduct' " sought to be " 'authorized or approved.' " *Id*. at ___; slip op at 24, quoting MCL 324.1705(2). The Court concluded that by limiting consideration to the desired conduct, the PSC "was following the plain language of MCL 324.1705(2)." *In re Application of Enbridge Energy to Replace & Relocate Line 5*, ___ Mich App at ___; slip op at 24.

The Court of Appeals also addressed the PSC's consideration of the risk of oil spills along the entire pathway of the alternative proposals. Though it expressed some concerns about the PSC's reasoning, it concluded that the decision was adequately supported by the record:

26

While [the PSC] could have limited its "alternatives" analysis merely to alternative methods of getting product *through the Straits*, it decided to examine *all* the presented alternatives to the Replacement Project. We acknowledge that it is concerning that the PSC, when discussing rail transport, looked to the effect of rail being used for the entire transport system and at first compared it to just the tunnel project; the [PSC] mentioned, for example, how many rivers and wetlands a rail system would cross but then did not mention the same statistics for Line 5 as a whole. [*Id*. at ___; slip op at 24.]

The panel went on to reject a related argument—that the PSC acted inconsistently when it considered evidence regarding greenhouse gas emissions resulting from hydrocarbons transported through Line 5, but it did not consider the risk of oil spills along the entire length of the pipeline. It explained that this was acceptable "because [the PSC] *could* have limited its 'comparisons' analysis to just alternatives for the Straits segment of pipeline . . . but instead decided to look to *all* presented alternatives[.]" *Id*. at ___; slip op at 25.

Finally, the Court of Appeals declined to consider FLOW's argument that the PSC was required to consider the common-law public trust doctrine in its analysis. The Court reasoned that the PSC had no authority to do so because "the PSC is a 'creature of the Legislature' and has no common-law powers; it 'possesses only that authority bestowed upon it by statute.' " *Id*. at ___; slip op at 22, quoting *Union Carbide Corp v Pub Serv Comm*, 431 Mich 135, 146, 428 NW2d 322 (1988).[15] In short, the Court of Appeals affirmed the PSC's ruling in all material respects.

---

[15] The Court of Appeals also rejected appellants' claim that the PSC erroneously excluded evidence regarding the public need for Line 5's continued operation in its order granting Enbridge's motion in limine. *In re Application of Enbridge Energy to Replace & Relocate Line 5*, ___ Mich App at ___; slip op at 18-22. However, appellants did not raise Act 16

27

## C. PROCEEDINGS BEFORE THIS COURT

Appellants sought leave to appeal in this Court, and we granted the applications. In Docket Nos. 168335 to 168339 (Bay Mills appellants), we directed the parties to address

> whether the Court of Appeals erred by: (1) applying a deferential standard of review rather than determining de novo whether the proposed conduct will pollute, impair, or destroy the air, water, or state's other natural resources or the public trust in these resources under MCL 324.1705(2) of [MEPA] in accordance with [*WMEAC*,] 405 Mich at 752-755; and (2) affirming the [PSC's] limitation on the scope of the evidence to be reviewed regarding its determinations under MCL 324.1705(2) of MEPA and its decision to exclude evidence of the history and risk of oil spills along the entire length of Line 5 in those determinations. [*In re Application of Enbridge Energy to Replace & Relocate Line 5*, ___ Mich ___, ___; 25 NW3d 327, 327 (2025).]

And in Docket No. 168346 (FLOW), we directed the parties to address

> whether: (1) in enacting MCL 324.1705(2) of [MEPA] the Legislature required the [PSC] to comply with the common-law public trust doctrine; (2) if not, the common-law public trust doctrine nonetheless requires such compliance, see *Glass*[, 473 Mich at 694-696]; and (3) if the [PSC] is required to comply with the common-law public trust doctrine, what a proper public trust analysis would entail in [PSC] proceedings. [*In re Application of Enbridge Energy to Replace & Relocate Line 5*, ___ Mich ___, ___; 25 NW3d 319, 319-320 (2025).]

## IV. STANDARD OF REVIEW

### A. GENERAL STANDARDS OF REVIEW AND PRINCIPLES OF STATUTORY INTERPRETATION

This case raises questions of statutory interpretation and the scope of agency authority, as well as the applicability of a common-law doctrine. All of these issues are reviewed de novo. See *Dep't of Licensing & Regulatory Affairs/Unemployment Ins Agency*

---

in their applications for leave to appeal, nor did we refer to it in our orders granting leave, so this issue is not before us.

*v Lucente*, 508 Mich 209, 230; 973 NW2d 90 (2021) (statutory interpretation and agency authority); *Kandil-Elsayed v F & E Oil, Inc*, 512 Mich 95, 109; 1 NW3d 44 (2023) (common law). "De novo review means we review the issue independently, without any required deference to the courts below." *People v Bruner*, 501 Mich 220, 226; 912 NW2d 514 (2018).

"When faced with questions of statutory interpretation, our obligation is to discern and give effect to the Legislature's intent as expressed in the words of the statute." *Pohutski v Allen Park*, 465 Mich 675, 683; 641 NW2d 219 (2002). "[A] statute must be read in its entirety," and each word and phrase " 'must be assigned such meanings as are in harmony with the whole of the statute, construed in the light of history and common sense.' " *Sweatt v Dep't of Corrections*, 468 Mich 172, 179, 180; 661 NW2d 201 (2003) (opinion by MARKMAN, J.) (citation omitted).

## B. APPELLATE REVIEW OF ADMINISTRATIVE MEPA DECISIONS

In our order granting leave to appeal, we asked the parties to address what standard of review applied to administrative agencies' MEPA decisions. The Court of Appeals concluded that MEPA did not require it to review the PSC's decision de novo. Instead, noting that the proceedings originated in the PSC and that they did not involve a lawsuit originating in circuit court, the panel applied the usual deferential standard of review for agency decisions. This was incorrect. MEPA decisions are reviewed de novo whether they originate as an administrative proceeding or through direct litigation in court, meaning that the reviewing court must "[consider] the legal issues independently," *Hairston v LKU*, ___ Mich ___, ___; ___ NW3d ___ (April 4, 2025) (Docket No. 166473); slip op at 8, and

29

"review . . . the record without deference to prior proceedings," see *Fletcher v Fletcher*, 447 Mich 871, 882; 526 NW2d 889 (1994). This conclusion is supported by MEPA's text and purpose.

### 1. MEPA'S TEXT

To begin, nothing in MEPA's text implies the existence of multiple standards of review. In *WMEAC*, we concluded that MCL 324.1704(3)—which states that "the court shall adjudicate the impact of the defendant's conduct on the air, water, or other natural resources, and on the public trust in these resources"—required a court to independently and nondeferentially review an agency decision after remitting a case to that agency for administrative proceedings. *WMEAC*, 405 Mich at 753 ("Courts can discharge their responsibility to make such determinations only if they make independent, *de novo* judgments.").

There is no meaningful difference between MCL 324.1705(2), the section at issue in this case, and the portions of MCL 324.1704 we interpreted in *WMEAC*. Compare MCL 324.1705(2) ("In administrative, licensing, or other proceedings, and *in any judicial review of such a proceeding*, the alleged pollution, impairment, or destruction of the air, water, or other natural resources, or the public trust in these resources, *shall be determined*[.]") (emphasis added) with MCL 324.1704(3) ("Upon completion of proceedings described in this section, the court *shall adjudicate* the impact of the defendant's conduct on the air, water, or other natural resources, and on the public trust in these resources[.]") (emphasis added). Both provisions require the court to adjudicate or determine whether the "conduct"

30

at issue is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources.

Moreover, the phrase "shall be determined" applies equally to "administrative, licensing, or other proceedings, *and in any judicial review of such a proceeding*[.]" MCL 324.1705(2) (emphasis added). So too does the command that "conduct shall not be authorized or approved." See *id*. Therefore, the Legislature did not indicate that a reviewing court should defer to the conclusions of the agency; to the contrary, "judicial review" is subject to the same standard as the tribunal that preceded it.[16]

In short, while MEPA creates multiple enforcement mechanisms, it includes only one substantive standard. Regardless of how a case originates, the task for the trial court—or agency—is the same. It must adjudicate or determine whether the "conduct" at issue "is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources[.]" MCL 324.1703(1); see also MCL 324.1704(2) and (3); MCL 324.1705(2).

## 2. MEPA'S PURPOSE

Requiring de novo review of an agency's MEPA decision is also consistent with MEPA's purpose. Through MEPA, the Legislature intended to spur the " 'judicial development of a common law of environmental quality[.]' " *Nemeth*, 457 Mich at 24, quoting *Ray*, 393 Mich at 307. Unlike other environmental protection statutes, which

---

[16] We also note that the dissent's view does not follow the clear text in the statute. The use of the phrase "shall be determined" in conjunction with "judicial review" in MCL 324.1705(2) and use of the phrase "court shall adjudicate" in MCL 324.1704(3) indicate the Legislature's mandate or requirement that *courts* must be the decision-makers.

31

empower agencies to promulgate rules and standards, "MEPA does not impose specific requirements or standards; instead, it provides for de novo review in Michigan courts, allowing those courts to determine any adverse environmental effect and to take appropriate measures." *Nemeth*, 457 Mich at 30, citing *Her Majesty the Queen in Right of the Province of Ontario v Detroit*, 874 F2d 332, 341 (CA 6, 1989).

Deference to agency decision-making is inconsistent with this scheme, as it would prevent the development of precedent applying MEPA in various contexts. Developing a consistent, adaptable jurisprudence is one of the reasons why we review de novo the interpretation and application of common-law doctrines. See *Kandil-Elsayed*, 512 Mich at 109. If deference were always given to agencies' MEPA determinations, then courts would never be able to independently make their own determinations, even if the underlying agencies' determinations were incorrect or at odds with existing rulings under MEPA. This would thwart the legislative goal of "developing a common law of environmental quality" through judicial decisions. *Ray*, 393 Mich at 306. See also *WMEAC*, 405 Mich at 754 (concluding that MEPA "would not accomplish its purpose if the courts were to exempt administrative agencies from the strict scrutiny which the protection of the environment demands"). And it would be inconsistent with MEPA's direction that courts must "determine[]" the likely environmental harm and not "authorize[]" harmful conduct. See MCL 324.1705(2).

Additionally, as we stated in *WMEAC*, MEPA's efficacy " 'will turn on how well circuit court judges meet their responsibility for giving vitality and meaning to the act through detailed findings of fact.' " *WMEAC*, 405 Mich at 754, quoting *Ray*, 393 Mich at 307-308. However, most appeals of administrative decisions are limited to the factual

record before the agency.  See MCL 24.304(3).  Depriving reviewing courts of the ability

to meaningfully engage with the factual record before them would significantly hamstring

MEPA.[17]

[17] Appellees, the Court of Appeals, and the dissent all raise concerns about the consequences of giving reviewing courts the responsibility to make factual findings.  The Court of Appeals noted that it "is not a finder of fact."  *In re Application of Enbridge Energy to Replace & Relocate Line 5*, ___ Mich App at ___; slip op at 23.  Appellees likewise note that appellate courts are not equipped to do the job of a trial court.  And the dissent argues that this Court is not equipped to review and pass on the "enormous record that formed the basis of the PSC's findings and opinions."  We have several responses to these concerns.

First, neither the dissent nor the Court of Appeals disputes that de novo review applies in citizen lawsuits, see *WMEAC*, 405 Mich at 754.  Whether an action begins within an agency or in circuit court, the record will often be complex and voluminous.  In other words, both avenues require judges to parse through complicated records on appeal.

Second, we reject appellees' contention that de novo review would *require* appellate courts to engage in factfinding, hold hearings, and even remodel existing appellate courtrooms to accommodate witness testimony.  Like many other issues that receive de novo review on appeal, de novo review of a lower tribunal's MEPA determination simply calls for a fresh application of the applicable law to the factual record.  See *WMEAC*, 405 Mich at 754 (applying de novo review "on the record presented" to determine MEPA compliance).  Indeed, MCL 324.1705(2) uses the phrase "judicial review," which is a term of art that means "[a] court's *review of* a lower court's or *an administrative body's* factual or legal findings."  *Black's Law Dictionary* (12th ed) (emphasis added).  Because the phrase contemplates a review of findings made by other tribunals, nothing in MEPA's plain language compels the reviewing court to take new evidence or otherwise become a factfinder.  And even if a reviewing court concludes that additional evidence is necessary to decide the case, the APA allows it to supplement the record or remand to the agency for further factual development.  See MCL 24.305; MCL 24.306(2).  Accordingly, holding that de novo review is required in this context breaks no new legal ground and is instead consistent with MEPA's text, structure, and purpose and the caselaw discussed herein.

And finally, we doubt that the practical problems raised by appellees and the Court of Appeals are likely to occur often.  The proper path to judicial review for many—if not most—administrative decisions is a petition for review under the APA.  See MCL 24.302.  These petitions are filed in circuit court, in which case many of appellees' arguments are inapplicable.  Furthermore, it bears noting that the PSC evidentiary hearings in this case

Moreover, failing to apply a de novo standard in this situation would create an anomaly where an agency's MEPA determination would be subject to different standards based on how the underlying cases commenced. It would also disincentivize interested parties—like appellants here—from intervening in agency proceedings to assert environmental protection claims, as doing so would significantly limit the scope of appellate review. Under the Court of Appeals' rule, similarly situated litigants would likely file direct MEPA actions in circuit court in order to obtain de novo review. That path poses its own procedural questions and creates the potential for duplicative litigation.

Finally, applying de novo review to an administrative agency's MEPA determination is further supported by past practice. Indeed, Enbridge accepted a de novo standard of review in its Court of Appeals briefing. Though the authority on this question is limited, the precedent that exists suggests that a de novo standard applies in appeals of agency MEPA decisions. See *Thomas Twp v John Sexton Corp of Mich*, 173 Mich App 507, 511; 434 NW2d 644 (1988) (concluding that an agency's MEPA determinations were reviewed de novo on appeal).[18]

In summary, interpreting MCL 324.1705(2) to provide for de novo review of administrative agencies' MEPA determinations is "the meaning that makes the most sense

---

were conducted by an ALJ. Like the Court of Appeals, the PSC reached its decision based on the parties' briefing, exhibits, and transcripts.

[18] In *State Hwy Comm v Vanderkloot*, 392 Mich 159, 190; 220 NW2d 416 (1974) (opinion by WILLIAMS, J.), Justice WILLIAMS suggested that a failure of the PSC to properly apply MEPA in a Highway Condemnation Act decision could be the basis for finding an abuse of discretion. But this part of the opinion garnered only three votes and is inconsistent with our more recent caselaw.

when the statute is read as a whole." *South Dearborn Environmental Improvement Ass'n, Inc v Dep't of Environmental Quality*, 502 Mich 349, 369; 917 NW2d 603 (2018). Accordingly, we hold that the Court of Appeals erred by applying a deferential standard of review to the PSC's MEPA determination[19] rather than analyzing de novo whether the proposed conduct satisfies MCL 324.1705(2).[20]

## V. ANALYSIS

The remaining issues in this case require us to examine whether the PSC and Court of Appeals correctly defined the scope of the MEPA inquiry, conducted an adequate comparison of the alternatives, and properly approved the Replacement Project. We must also decide whether MEPA mandates consideration of the common-law public trust doctrine.

---

[19] To be clear, our decision today only applies to appellate review of agency findings regarding MEPA. Nothing about our opinion alters the appellate review standard for other agency matters. See *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 102; 754 NW2d 259 (2008) (noting that different standards of review apply to different "administrative functions").

[20] We recognize that the standard of review for many agency decisions is set by Const 1963, art 6, § 28. But the plain language of our Constitution only sets a *minimum* standard for judicial review. See Const 1963, art 6, § 28 ("[Judicial review of agency decisions] shall include, *as a minimum*, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record.") (emphasis added). Article 6, § 28 does not require its standard of review to be applied to all agency decisions, nor does it bar the Legislature from providing for more searching judicial review when it wishes.

## A. SCOPE OF ANALYSIS UNDER MEPA

As described above, the scope of the PSC's MEPA analysis has been hotly contested throughout this case. The PSC said it would limit its consideration to the Replacement Project because the construction of the tunnel was the "conduct" at issue. The Court of Appeals and Enbridge agree with this determination. The Bay Mills appellants argue that the PSC should have also considered whether the tunnel would extend Line 5's operational lifespan and the potential harms that might result from such an extension. We hold that, under MEPA, harms asserted beyond the conduct itself must be examined to determine if they are factually and proximately caused by the conduct. On remand, the PSC must apply this framework and determine whether the Replacement Project will factually and proximately cause Line 5's extended lifespan and attendant harms.[21]

Under MEPA, the factfinder must first define the "conduct" at issue. See MCL 324.1703(1); MCL 324.1704(2); MCL 324.1705(2). Next, it must determine or adjudicate whether the conduct will cause "pollution, impairment, or destruction of the air, water, or other natural resources, or the public trust in these resources[.]" MCL 324.1705(2). See also MCL 324.1703(1). This analysis requires the factfinder to determine the specific harms at issue and assess the magnitude of those harms. If the factfinder determines that the conduct at issue poses no meaningful environmental harm, the analysis ends. But if the factfinder determines that the environmental harms are the "likely-. . . effect[s]" of the conduct at issue, the factfinder may not permit the conduct if a "feasible and prudent alternative" exists. MCL 324.1705(2); see also MCL 324.1703(1).

---

[21] We do not address whether the PSC can consider likely environmental harms occurring outside of Michigan because that question is not necessary to resolve this appeal.

36

## 1. CONDUCT

We start with the meaning of the term "conduct" under MEPA. Numerous provisions of MEPA use the term "conduct" to describe the action under consideration. See, e.g., MCL 324.1703(1); MCL 324.1704(2); MCL 324.1705(2). "Conduct" is distinguishable from alleged environmental harms, which are addressed in the next subsection of this opinion. In citizen MEPA suits, the allegations in the plaintiff's complaint define the conduct at issue. Cf. *WMEAC*, 405 Mich at 750-751 (looking to the complaint to determine the conduct being challenged). In administrative proceedings—whether initiated by an agency under MCL 324.1705(2) or remitted to an agency by the court under MCL 324.1704(2)—the subject of the proceedings is the conduct at issue under MEPA. See MCL 324.1704(2) ("If administrative, licensing, or other proceedings are required or available *to determine the legality of the defendant's conduct*, the court may direct the parties to seek relief in such proceedings.") (emphasis added). Depending on the circumstances, this may be defined by an application or permit request, or by statute or regulation.

Because the "conduct" is defined by the pleadings or the nature of the administrative proceedings, the factfinder should be able to determine the scope of the conduct at issue at the outset of a case. Often, but perhaps not always, this question will be relatively clear-cut and will not require significant discovery or factual investigation.[22] That being said,

_____

[22] *WMEAC* provides an example of how defining "conduct" may cause problems. Although the plaintiffs alleged that the drilling of certain oil and gas wells would cause environmental harms, they did not directly challenge the permits for these wells in their complaint. *WMEAC*, 405 Mich at 750-751. This led our Court to question whether the drilling was within the scope of the conduct at issue. *Id*. However, we noted that the plaintiffs could have resolved that issue by filing an amended complaint. *Id*.

we also note the importance of properly determining what conduct is at issue and what the objectives of an agency are.[23]

## 2. ASSESSMENT OF HARM

Once the relevant "conduct" is established, MEPA requires courts and agencies to determine or adjudicate whether the conduct in question "has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources[.]" MCL 324.1703(1). See also MCL 324.1704(2) and (3); MCL 324.1705(1) and (2). This analysis can be broken into two steps: (1) determining which harms are at issue and (2) assessing the scope of those harms.

## a. DETERMINING THE HARMS AT ISSUE

At the first step, the factfinder—aided by the parties[24]—must determine what kind of environmental risks the conduct in question poses. This defines the scope of the

---

[23] We note that federal courts have observed that properly defining the conduct is key to properly assessing the environmental impact at issue and evaluating alternatives in NEPA cases. See, e.g., *Colo Environmental Coalition v Dombeck*, 185 F3d 1162, 1174 (CA 10, 1999) ("The Seventh Circuit, and other courts, have interpreted this requirement to preclude agencies from defining the objectives of their actions in terms so unreasonably narrow they can be accomplished by only one alternative (*i.e.*, the applicant's proposed project). Agencies also are precluded from completely ignoring a private applicant's objectives.") (citations omitted); *Citizens for Smart Growth v Secretary of the Dep't of Transp*, 669 F3d 1203, 1212 (CA 11, 2012) (" 'Nor may an agency frame its goals in terms so unreasonably broad that an infinite number of alternatives would accomplish those goals and the project would collapse under the weight of the possibilities.' "), quoting *Citizens Against Burlington, Inc v Busey*, 290 US App DC 371, 377; 938 F2d 190 (1991).

[24] We emphasize that MEPA does not leave courts and agencies to struggle with this question alone. In citizen suits, plaintiffs have the initial burden of establishing that "the conduct of the defendant has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources[.]" MCL 324.1703(1). And, as happened in this case, both private parties and governmental

38

factfinder's MEPA analysis: which harms must be determined or adjudicated (and then considered in the alternatives analysis), and which do not? MEPA focuses on those harms that are "likely . . . effect[s]" of the conduct. MCL 324.1705(1) and (2). Although this concept appears broad, MEPA's text limits its scope by requiring both factual causation (i.e., the harm is an "effect" of conduct) and proximate causation (i.e., the harm is "likely"). See *Haliw v Sterling Hts*, 464 Mich 297, 305-308; 627 NW2d 581 (2001) (discussing causation).

Factual causation concerns whether "the defendant's conduct in fact caused [the] harm" at issue. *Ray v Swager*, 501 Mich 52, 64; 903 NW2d 366 (2017) (quotation marks and citation omitted). This is often referred to as but-for causation because conduct cannot be the factual cause of a harm unless "the harmful result would not have come about but for the defendant's . . . conduct." *Haliw*, 464 Mich at 310.

In contrast, proximate causation focuses on "whether it was foreseeable that the defendant's conduct could result in [the] harm" at issue and whether the defendant should be held responsible.[25] *Ray*, 501 Mich at 65. Proximate cause exists where an action creates the injury " 'in a natural continuous sequence, unbroken by any new, independent cause[.]' " *Black v Shafer*, 499 Mich 950, 951 (2016), quoting *McMillian v Vliet*, 422 Mich

---

entities may intervene in administrative proceedings to assert that the conduct in question "has, or is likely to have" these effects. MCL 324.1705(1).

[25] In the tort law context, we have stated that "only a human actor's breach of a duty"— and not "nonhuman and natural forces, such as a fire"—"can be a proximate cause." *Ray*, 501 Mich at 71-72 (considering the definition of "the proximate cause" in the governmental tort liability act, MCL 691.1407(2)(c)). These restrictions do not carry over into the MEPA context—it is apparent from MEPA's subject matter that the Legislature was concerned with the effects of natural forces, in addition to human actions.

570, 576; 374 NW2d 679 (1985). This analysis also recognizes that "[t]wo [or more] causes frequently operate concurrently so that both constitute a direct proximate cause of" a given injury or harm. *McMillian*, 422 Mich at 577. "The foreseeability of consequences" distinguishes proximate causation from factual or but-for causation. *Haliw*, 464 Mich at 310.

The application of proximate causation principles in this context is not unique—the United States Supreme Court has stated that "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause," which can be "analogized . . . to the 'familiar doctrine of proximate cause from tort law.' " *Dep't of Transp v Pub Citizen*, 541 US 752, 767; 124 S Ct 2204; 159 L Ed 2d 60 (2004), quoting *Metro Edison Co v People Against Nuclear Energy*, 460 US 766, 774; 103 S Ct 1556; 75 L Ed 2d 534 (1983).[26] Consequently, when "the causal chain" between a proposed project and its potential effects "is too attenuated," federal agencies need not consider such effects under NEPA. *Metro Edison*, 460 US at 774.

---

[26] Notwithstanding the many differences between MEPA and NEPA, see note 5 of this opinion, the well-developed body of NEPA caselaw can still provide guidance in applying MEPA provisions that have federal analogues, especially in the context of proximate causation and comparison of alternatives. See *Chmielewski v Xermac, Inc*, 457 Mich 593, 601-602; 580 NW2d 817 (1998) (instructing that federal precedent interpreting federal statutes is "persuasive, although not necessarily binding" when interpreting analogous state statutes). Notably, the federal proximate cause caselaw cited in this opinion interprets a section of NEPA that requires an agency to consider the environmental "effect[s]" of a proposed project. See *Metro Edison*, 460 US at 772, quoting 42 USC 4332(C)(i) and (ii). This language is comparable to how MCL 324.1705(2) directs agencies and reviewing courts to examine the likely "effect[s]" of a proposed project. Given this statutory similarity, we find this particular body of NEPA caselaw instructive to the issue presented in this portion of MEPA.

Proximate cause thus requires more than "speculation or conjecture," and "[a] mere possibility . . . is not enough" to establish *but-for* causation—let alone proximate causation. *Skinner v Square D Co*, 445 Mich 153, 165; 516 NW2d 475 (1994) (quotation marks and citations omitted). See also *Robertson v Methow Valley Citizens Council*, 490 US 332, 356; 109 S Ct 1835; 104 L Ed 2d 351 (1989) (noting that agencies need not devote undue attention to "highly speculative harms" in their NEPA analyses); *Seven Co Infrastructure Coalition v Eagle Co, Colo*, 605 US 168, 198; 145 S Ct 1497; 221 L Ed 2d 820 (2025) (Sotomayor, J., concurring in the judgment) ("Nor is an agency responsible for impacts that, though technically avoidable, are so causally attenuated from or ancillary to the agency's statutorily assigned tasks that it could not reasonably have been expected to consider them as part of its decisionmaking process."). In other words, some hard-to-quantify risks may be too uncertain and diffuse to warrant MEPA scrutiny.

We recognize that these analyses are rarely simple. Determining the harm of the relevant conduct is a factually intensive inquiry and does not lend itself to hard-and-fast rules. Courts and agencies must use common sense and apply basic proximate cause principles to the cases they face. See *Ray*, 393 Mich at 306-307. In doing so, a factfinder should not fully quantify the effects of a risk until it determines the risk is a result of the proposed conduct. This analysis therefore necessitates a case-by-case inquiry that "allows the courts to fashion standards in the context of actual problems as they arise in individual cases . . . ." *Id.*[27]

---

[27] The way that courts and agencies conduct this inquiry has significant real-world stakes. Even minor repairs, like replacing a valve or patching a small hole, might *cause* a large infrastructure project like a pipeline to continue operating. But, as appellees, their amici, and the dissent argue, if small repair projects or upgrades can lead to a full MEPA review

### b. ASSESSING THE IMPACT OF THE HARMS AT ISSUE

Once the factfinder has determined which environmental risks are actually relevant to the conduct, it must then carry out its statutory duty to adjudicate or determine "the impact of the defendant's conduct on the air, water, or other natural resources, and on the public trust in these resources[.]"  MCL 324.1704(3).  See *WMEAC*, 405 Mich at 753 (stating that "the court has a responsibility to 'adjudicate' and 'determine' whether 'adequate protection from pollution, impairment or destruction has been afforded' ").  As part of this process, it may also create or adopt environmental standards.  MCL 324.1701(2) (giving courts authority to "[d]etermine the validity, applicability, and reasonableness of [environmental] standard[s]" and to "direct the adoption of a standard approved and specified by the court").  The results reached at this step bear heavily on the alternatives analysis and the ultimate decision of whether to allow the challenged conduct, as will be discussed in more detail below.

Equally critical, the factfinder's determination at this stage that there is no—or minimal[28]—environmental harm will end the MEPA analysis.  As we noted in *Oscoda*

---

of a major piece of existing infrastructure, that would both discourage making necessary repairs and encourage unnecessary litigation.  Such a result would cut against MEPA's undisputed purpose of preventing environmental degradation by leaving minor, yet potentially dangerous, conditions unaddressed and distracting courts and agencies from more pressing environmental matters.  See *Ray*, 393 Mich at 306.  When making these causal determinations, courts and agencies must consider "the public health, safety, and welfare," along with "the state's paramount concern for the protection of its natural resources."  See MCL 324.1703(1); MCL 324.1705(2).  See also *Metro Edison*, 460 US at 774 n 7 ("[C]ourts must look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not.").

[28] *WMEAC* stated in passing that *de minimis* environmental harms may not trigger MEPA scrutiny.  *WMEAC*, 405 Mich at 760 ("We recognize that virtually all human activities can

42

*Chapter of PBB Action Comm, Inc v Dep't of Natural Resources*, 403 Mich 215, 233; 268 NW2d 240 (1978) (opinion by LEVIN, J.), "[t]he standard, 'has, or is likely to pollute, impair or destroy', is a limitation as well as a grant of power." In order for a MEPA claim to proceed to the alternatives analysis or for a court to exercise its equitable powers under MCL 324.1701(1), there must be a finding of environmental harm. See *id*. at 232-233.[29]

### 3. CONDUCT AND HARMS APPLICATION

The PSC was required to determine the Replacement Project's "alleged pollution, impairment, or destruction of the air, water, or other natural resources, or the public trust in these resources[.]" MCL 324.1705(2).[30] It concluded that its "MEPA review [did] not extend to the entirety of Line 5, including the 641 miles of Line 5 outside of the proposed Replacement Project, but only to the 'replacement of the Dual Pipelines with a new, 30-inch-diameter, single pipeline to be relocated within a new concrete-lined tunnel.' " We

---

be found to adversely impact natural resources in some way or other. The real question before us is when does such impact rise to the level of impairment or destruction?"). This case does not present us with the opportunity to further delineate the standard for determining whether a harm satisfies this threshold.

[29] The dissent suggests that this framework would mean that repairs to "motor vehicles, power tools, appliances, lawn and garden machines, [and] barbeque grills" and the replacement of lead pipes would violate MEPA. Even assuming that litigation of this nature will arise, we trust that lower courts—and agencies—will have no trouble applying the framework we articulate in this opinion. For example, the dissent's suggestion that "replacing lead water pipes in a home would require an environmental assessment of an entire water distribution infrastructure" completely fails to account for the proximate cause requirement set forth in MEPA.

[30] The availability of alternatives is addressed in the Part V(B) of this opinion. This part first focuses on the preliminary steps of defining the "conduct" at issue and determining what environmental risks that conduct poses. Both are necessary before turning to the alternatives analysis.

conclude that the PSC erred by not examining whether the Replacement Project would be the proximate cause of further environmental harms by extending Line 5's lifespan. Specifically, the PSC improperly declined appellants' request to introduce evidence regarding the current dual pipelines' condition and lifespan, when that evidence might have been relevant to determining whether the Replacement Project would cause Line 5's continued operation and the resulting environmental impacts.

At the outset, defining the conduct at issue presents no significant difficulty here. The Replacement Project was the subject of the PSC proceedings—it was the project for which Enbridge sought approval in its Act 16 application. Indeed, the Bay Mills appellants do not appear to contest the PSC's determination that the Replacement Project was the *conduct*. Instead, they argue that Line 5's continued operation should be considered an *effect* of the Replacement Project.

The parties' dispute is better framed as an argument about proximate causation. Their key disagreement is whether building the Replacement Project will *cause* the environmental risks posed by Line 5's continued operation.[31] The Bay Mills appellants argue that, if the Replacement Project is not built, Line 5 will be forced to shut down because the current dual pipelines are deteriorating. In essence, their argument is that the risks linked to Line 5's continued operation are a *foreseeable* consequence of the conduct at issue—the Replacement Project. Accordingly, they claim that, because the Replacement Project will allow Line 5 to continue transporting hydrocarbons for at least 99 years, the

---

[31] In its alternatives analysis, the PSC acknowledged that Line 5's operations pose *some* environmental risk, whether through the risk of oil spills or the emission of greenhouse gases. However, we do not need to quantify those risks for the purposes of this opinion.

44

project will be the cause of the environmental consequences of Line 5's continued operation. Thus, they argue that MEPA requires that these consequences must be "determined."

Appellees, in contrast, deny any causal connection altogether. They contend that Line 5 will continue operating whether the Replacement Project is built or not. Therefore, they argue that the Replacement Project itself will not *cause* any environmental harms resulting from the rest of the pipeline, and thus, any such harm is outside the scope of MEPA review. How this technical dispute about the service lives of underwater pipelines is resolved will influence the proximate causation analysis.

Though appellants asked for the opportunity to develop the record regarding the Replacement Project's impact on Line 5's continued operation, the PSC declined their request because it concluded Enbridge had the legal right to continue operating Line 5. This was error. For purposes of the MEPA harm analysis, Line 5's continued operation, with and without the Replacement Project, was a *factual* question, not just a legal one. The PSC, as the MEPA factfinder, was required to determine what the real-world environmental consequences of building the Replacement Project would be before approving it.[32]

---

[32] The dissent claims that we "hold[] that the continued operation of Line 5 is itself a relevant adverse environmental effect of the Replacement Project." This is not an accurate description of our holding. We only conclude that alleged environmental harms due to the continued operation of Line 5 *could be* an effect of the Replacement Project, *if* the Replacement Project is the proximate cause of Line 5's continued operation. We reach no conclusion as to whether this is true and leave the question for the PSC to answer on remand.

Finally, we note that the PSC evaluated the greenhouse gases that would be emitted by the consumption of hydrocarbons flowing through Line 5. This would be one potential harm to consider under MEPA *if* the Replacement Project causes the pipeline's continued operation—though there could be other harms to consider as well. If, however, the Replacement Project is not the proximate cause of Line 5's continued operations, then these emissions cannot be attributable to it. We agree with appellants that the PSC acted inconsistently by considering greenhouse emissions from the pipeline as a whole in its harms analysis, but declining to consider other environmental risks (like oil spills) using that same scope. Indeed, Enbridge does not appear to defend this aspect of the PSC's analysis, and argues instead that considering the greenhouse gas emissions was unnecessary, though harmless.

The framework that we draw from the text of MEPA today was not previously available to the PSC.[33] To accurately assess the environmental consequences of the Replacement Project, the PSC should have determined whether the project would be the proximate cause of Line 5's continued operation and its alleged attendant harms. Without doing so, the PSC was unable to fulfill its obligations under MEPA to determine what "pollution, impairment, or destruction of the air, water, or other natural resources, or the public trust in these resources," the project might cause. MCL 324.1705(2).

---

[33] To be clear, though the dissent accuses us of using de novo review to "dismiss the PSC's determinations or even substitute [our] own beliefs for the PSC's findings," we make no determinations or findings about the Replacement Project's environmental effects or compliance with MEPA in this opinion. We simply identify legal errors in the PSC's application of MEPA and remand to allow *the PSC* to make the necessary factual determinations in the first instance.

B. MEPA ALTERNATIVES ANALYSIS

We now turn to the final inquiry under MCL 324.1705(2): the analysis of feasible and prudent alternatives. Appellants argue that the PSC's alternatives analysis was flawed because it took an inconsistent approach to the scope of the project. Specifically, when comparing the environmental impact of transporting hydrocarbons from Superior, Wisconsin, to Sarnia, Ontario, to the alternatives, the PSC only assessed the impact of transporting hydrocarbons across the Mackinac Straits. For example, when it considered the risk of oil spills, it looked at the *entire length* of the rail transport alternative—which completely replaced Line 5. But for the Replacement Project, it looked only at the Straits segment. The Court of Appeals, while questioning this approach, concluded that this inconsistency was immaterial to the result. Enbridge takes the same position. But we agree with appellants that the PSC's alternatives analysis included errors that did not allow for a reasoned choice among the alternatives.

1. LEGAL PRINCIPLES

Once a court—or an agency—finds that the conduct at issue "has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources," MCL 324.1703(1), the next step is to determine whether there is a "feasible and prudent alternative" that avoids or mitigates these effects, see MCL 324.1705(2).[34] This analysis must be "sufficient to permit a

―――――――――

[34] MEPA does not expressly state that the object of this analysis is to find a less environmentally harmful alternative to the conduct being considered. See MCL 324.1703(1); MCL 324.1705(2). But MCL 324.1703(1) directs the court to consider "the state's paramount concern for the protection of its natural resources from pollution, impairment, or destruction" in this analysis, at least with respect to "citizen suits" brought under MEPA. Moreover, there would be no reason to evaluate alternatives to the conduct

47

reasoned choice of alternatives so far as environmental aspects are concerned." *Natural Resources Defense Council, Inc v Morton*, 148 US App DC 5, 14; 458 F2d 827 (1972). A finding of harm is necessary to reach this step since, as previously noted, MEPA does not empower courts or agencies to act if there is no environmental danger. See *Oscoda*, 403 Mich at 231 (opinion by LEVIN, J.).

But deciding the "pollution, impairment, or destruction" at issue does more than just trigger the alternatives analysis—it guides it. It is impossible to prevent or mitigate an environmental risk without understanding the nature of that risk. That is, determining the feasibility or prudence of an "alternative" necessarily calls for a benchmark that the alternative(s) may be evaluated against. That benchmark is the harm caused by the proposed conduct. Accordingly, a meaningful examination of the alternatives cannot occur until the "impact of [the relevant] conduct on the air, water, or other natural resources, and on the public trust in these resources," is determined. MCL 324.1704(3).[35] This analysis

_____

under consideration if not to determine whether they would mitigate environmental harm. To hold otherwise would "not [be] a reasonable reading of the text of the statute." *Ally Fin Inc v State Treasurer*, 502 Mich 484, 496; 918 NW2d 662 (2018). See also *G C Timmis & Co v Guardian Alarm Co*, 468 Mich 416, 421; 662 NW2d 710 (2003) (stating that a provision's language "must be read in context with the entire act, and the words and phrases used there must be assigned such meanings as are in harmony with the whole of the statute") (quotation marks and citation omitted).

[35] The PSC argues that once the factfinder determines that the conduct at issue will cause *some* environmental harm, it may move directly to the alternatives analysis without examining the nature or degree of that harm, or investigating other potential sources of harm. This contention is inconsistent with MEPA's statutory directives that harms shall be "determined," MCL 324.1705(2), and "adjudicate[d]," MCL 324.1704(3). It also fails to consider the object of the alternatives analysis: avoiding environmental harm. That cannot be done without first understanding what the harms are to be avoided. Indeed, the more (or less) harm a project may cause necessarily bears on the availability of a "feasible and prudent" alternative. The same plan might be a "prudent" alternative if it avoids major

48

of environmental impacts is distinct from the requirements that an alternative be feasible, prudent, and consistent with the public health, safety, and welfare. MCL 324.1705(2); MCL 324.1703(1). Accordingly, they may be considered independently, though both bear on the factfinder's final decision.

In addition to considering whether potential alternatives are "feasible and prudent," MCL 324.1703(1); MCL 324.1705(2), MEPA also requires consideration of "the public health, safety, and welfare" in two different sections. However, its descriptions of this requirement appear inconsistent. MCL 324.1703(1), which describes the parties' respective burdens in citizen suits, states that the defendant must show that their "*conduct is consistent with* the promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment, or destruction." (Emphasis added.) For its part, MCL 324.1705(2), which governs administrative proceedings, states that "conduct shall not be authorized or approved that has or is likely to have such an effect *if there is a feasible and prudent alternative consistent* with the reasonable requirements of the public health, safety, and welfare." (Emphasis added.)

Enbridge notes that, in citizen suits under MCL 324.1703(1), the court must consider whether defendant's conduct is consistent with the public health, safety, and welfare. But, based on the differences in MCL 324.1705(2)'s wording, it argues that the factfinder is not obligated to consider whether the *conduct* at issue is consistent with the

---

environmental damage, but "imprudent" if it would result in greater harms than the conduct at issue.

49

public health, safety, and welfare. Rather, Enbridge contends, the PSC is only required to consider the reasonable requirements of the public health, safety, and welfare as a means of ruling out alternatives.

We do not believe the Legislature intended for the MEPA standard to differ between citizen suits and administrative proceedings. Both provisions require examining alternatives. Compare MCL 324.1703(1) to MCL 324.1705(2). And both require examining the public health, safety, and welfare. An alternative cannot be analyzed without having a baseline to compare it to: the conduct at issue. So, as with environmental harm, it is impossible to conduct a meaningful analysis of whether a "prudent alternative" is "consistent with the reasonable requirements of the public health, safety, and welfare," MCL 324.1705(2), without an understanding of the project's impacts. Moreover, the conduct must be compared to the alternative of taking no action. If forgoing the project entirely is "a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety, and welfare," then MCL 324.1705(2)'s plain language requires that the conduct not be authorized or approved. On the other hand, taking no action is also often infeasible or inconsistent with the public health, safety, and welfare. Accordingly, we read MCL 324.1705(2) to require that *both* the conduct and alternatives be consistent with "the public health, safety, and welfare." See *Gross v Gen Motors Corp*, 448 Mich 147, 164; 528 NW2d 707 (1995) ("[C]ourts are bound to construe statutes so as to give them validity and a reasonable construction; seeming inconsistencies in the various provisions of a statute should be reconciled, if possible, so as to arrive at a meaning that gives effect to all parts of the statute.").

50

## 2. MEPA ALTERNATIVES APPLICATION

Appellants fault the PSC for declining to consider the risk of oil spills along Line 5's entire length when assessing the Replacement Project but accounting for total spill risk posed by some of the alternatives, including constructing a new line, rail, trucking, and different pipeline routes. They contrast this with the PSC's decision to consider the products flowing through Line 5 as *a whole* when it compared the Replacement Project and its alternatives' effect on greenhouse gas emissions. Neither Enbridge, nor the Court of Appeals, nor the dissent endorses this aspect of the PSC's analysis. Instead, they contend—in essence—that the PSC's apples to oranges comparison was harmless, because the proper MEPA analysis should have been limited to the Replacement Project. See *In re Application of Enbridge Energy to Replace & Relocate Line 5*, ___ Mich App at ___; slip op at 25 ("We conclude that the [PSC] acted appropriately because it *could* have limited its 'comparisons' analysis to just alternatives for the Straits segment of pipeline . . . but instead decided to look to *all* presented alternatives[.]"). In other words, the Court of Appeals determined that the PSC erred by analyzing *too much*, but that the error was harmless because the PSC still approved the Replacement Project.

The alternatives analysis exists under MEPA to determine if there is a feasible and less environmentally harmful pathway than the challenged conduct. In order for this analysis to accomplish its goals, the environmental impact of the conduct at issue must be compared with that of the alternatives being considered. An analysis that fails to do so will not allow "a reasoned choice of alternatives." See *Natural Resources Defense Council, Inc*, 148 US App DC at 14.

51

The inconsistencies in the PSC's comparisons did not allow for such a "reasoned choice." Instead of comparing alternatives that would fully replace Line 5 with the pipeline as a whole, it compared them to the Replacement Project alone—without acknowledging and accounting for the difference. Appellants are correct that this is an apples to oranges comparison. The PSC might have easily accounted for the differences in scope—even if it were just by noting the numbers of rivers and wetlands Line 5 crosses, as it did for the alternative southern pipeline route and the rail transport alternative. That could have allowed it to make a reasoned choice between the alternatives before it. But the comparison the PSC actually made did not. This was error.[36]

## C. PUBLIC TRUST

As already summarized, Michigan has long recognized that the state has an obligation to protect the Great Lakes and serves as "trustee of public rights in the Great Lakes for fishing, hunting, and boating for commerce or pleasure." *Glass*, 473 Mich at 679. MEPA protects "the air, water, or other natural resources, or the public trust in these resources[.]" MCL 324.1705(2). FLOW argues that MEPA requires courts and agencies to apply the public trust doctrine. The Court of Appeals held that the PSC lacked the authority to do so because it "has no common-law powers[.]" *In re Application of Enbridge*

_____

[36] Like Enbridge and the Court of Appeals, the dissent concedes that the PSC's alternatives analysis was "misguided," but claims that this error was harmless, "since the PSC ultimately approved the Replacement Project." Its conclusion relies on the assumption that the rest of Line 5 was *necessarily* outside the scope of MEPA review. Operating under that assumption, the dissent's conclusion is not an unreasonable one. But, as described elsewhere in this opinion, the environmental harms caused by the remainder of Line 5 *might* be a likely effect of the conduct at issue—the Replacement Project. Once one accepts this possibility, the errors in the PSC's analysis cannot be dismissed as harmless.

*Energy to Replace & Relocate Line 5*, ___ Mich App at ___; slip op at 29. We agree with FLOW and hold that MEPA requires separate consideration of harms to public trust resources.

## 1. PUBLIC TRUST AND MEPA

MEPA protects against "pollution, impairment, or destruction of the air, water, or other natural resources, *or the public trust in these resources*[.]" MCL 324.1705(2) (emphasis added). "When an undefined statutory term is a legal term of art, the term must be construed in accordance with its peculiar and appropriate legal meaning." *Batista v Office of Retirement Servs*, 515 Mich 283, 298; 29 NW3d 115 (2024) (quotation marks and citation omitted). "Moreover, when the Legislature chooses to employ a common-law term without indicating an intent to alter the common law, the term will be interpreted consistent with its common-law meaning." *In re Bradley Estate*, 494 Mich 367, 377; 835 NW2d 545 (2013).[37] Here, the public trust doctrine was well recognized by our common law when MEPA was enacted in 1970. Ten years earlier, in *Obrecht*, 361 Mich at 412, we said that we had long ago "committed ourselves . . . to the universally accepted rules of such trusteeship . . . ." In this instance, we believe that "the language of [the] statute is clear and unambiguous," and further construction is neither necessary nor permissible. *Daher v*

---

[37] See also *Hodge v State Farm Mut Auto Ins Co*, 499 Mich 211, 218; 884 NW2d 238 (2016) ("When the Legislature, without indicating an intent to abrogate the common law, 'borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.' ") (some quotation marks and citation omitted), quoting *Sekhar v United States*, 570 US 729, 733; 133 S Ct 2720; 186 L Ed 2d 794 (2013) (quotation marks and citation omitted).

*Prime Healthcare Servs-Garden City, LLC*, 515 Mich 254, 263; 29 NW3d 136 (2024) (quotation marks and citation omitted).

Despite the express statutory incorporation of the term "public trust," the Court of Appeals concluded that the PSC could not consider the public trust doctrine because, in its view, "the PSC is a 'creature of the Legislature' and has no common-law powers; it 'possesses only that authority bestowed upon it by statute.' " *In re Application of Enbridge Energy to Replace & Relocate Line 5*, ___ Mich App at ___; slip op at 22, quoting *Union Carbide Corp*, 431 Mich at 146. Although it is true that the PSC "has only the authority granted to it by the Legislature," *In re Reliability Plans of Electric Utilities for 2017–2021*, 505 Mich 97, 119; 949 NW2d 73 (2020), through MEPA, the Legislature has granted it the authority—and indeed, the responsibility—to consider the public trust doctrine. See MCL 324.1705(2) ("*In administrative, licensing, or other proceedings*, and in any judicial review of such a proceeding, the alleged pollution, impairment, or destruction of the air, water, or other natural resources, or *the public trust in these resources*, *shall be determined*[.]") (emphasis added).

The more substantial question is what courts and agencies are required to consider in order to safeguard the "the public trust in [natural] resources[.]" Specifically, what additional analysis must the PSC provide over and above its consideration of "air, water, or other natural resources"? Although Enbridge argues that "public trust" is subsumed within the ether of "air, water, or natural resources," we disagree. Otherwise, use of the separate term "public trust" in MCL 324.1705(2)—and throughout MEPA—would be rendered surplusage or nugatory. See *People v Tadgerson*, ___ Mich ___, ___; ___ NW3d ___ (July 21, 2025) (Docket No. 165678); slip op at 4 (explaining that courts "must give

54

effect to every word, phrase, and clause and avoid an interpretation that would render any part of the statute surplusage or nugatory") (quotation marks and citation omitted).[38]

As far back as 1982, our Court of Appeals recognized the disjunctive language of MEPA as creating distinct protections for "the air, water or other natural resources" and "the public trust therein." *Stevens v Creek*, 121 Mich App 503, 507; 328 NW2d 672 (1982) (quotation marks, citations, and emphasis omitted). Instead, we hold that the Legislature incorporated the common-law public trust doctrine specifically and separately. Accordingly, the correct way to define "public trust" in MEPA is by looking to the common-law public trust doctrine.

We discussed the scope of the doctrine extensively in *Glass*.[39] There, we explained that "the public trust doctrine serves to protect . . . the waters of the Great Lakes and their submerged lands[.]" *Glass*, 473 Mich at 694. "As trustee, the state must preserve and protect specific public rights below the ordinary high water mark and may permit only those private uses that do not interfere with these traditional notions of the public trust."

---

[38] We do recognize that there is often some overlap between a project's impact on natural resources and its impact on the public trust in those resources. But these analyses are not entirely the same. As explained in this opinion, the public trust doctrine goes beyond pollution, impairment, or destruction of natural resources by protecting the public's right to *use* or *access* certain resources for "fishing, hunting, and boating for commerce or pleasure." *Glass*, 473 Mich at 679, 681. For instance, in *Glass*, the beach-walking at issue left nothing more than footprints in the sand. But the public trust doctrine applied to protect that activity regardless. So the public trust doctrine contemplates activities *outside* of the environmental degradation addressed by the rest of MCL 324.1705(2).

[39] *Glass* expressly limited its public trust analysis to the Great Lakes and thus did not "consider how it has applied to inland bodies of water." *Glass*, 473 Mich at 678 n 6. Likewise, in this case, we need not define the contours of a public trust analysis under MEPA outside of the context of the Great Lakes.

*Id*.  We listed "fishing, hunting, and navigation for commerce or pleasure" as the "traditionally articulated" public trust rights.  *Id*. at 695.  However, we also recognized an obligation to "safeguard[] activities inherent in the exercise of those rights," which we found to include the right to "[walk] the lakeshore below the ordinary high water mark . . . because gaining access to the Great Lakes to hunt, fish, or boat required walking to reach the water."  *Id*. at 696.

Thus, considering the "public trust" under MEPA requires consideration of the public's right to fish, hunt, travel through, and otherwise utilize the Great Lakes.[40]  It has long been understood that preservation of these public rights entails the preservation of the natural resources upon which they depend.  See *Silberwood*, 110 Mich at 104 (approving a law barring the cutting of rushes and other aquatic vegetation in order to preserve a hunting habitat); *Obrecht*, 361 Mich at 416 (holding that the state could bar construction of a "permanent deep water dock or pier" to protect public trust rights).[41]  Just as the MEPA

[40] We do not intend to provide a comprehensive list or definition of the rights protected by the public trust doctrine.  *Glass* noted that additional rights had been recognized in Michigan, see *id*. at 695 n 25 (cutting ice, floating logs down inland rivers), and other jurisdictions, see *id*. at 695, quoting *Town of Orange v Resnick*, 94 Conn 573, 578; 109 A 864 (1920) ("bathing, taking shellfish, gathering seaweed, cutting sedge").  The common law has fleshed this out in the past and undoubtedly will do so in the future.

[41] Appellant FLOW invites us to hold that proper consideration of the public trust requires the PSC to refer this case to EGLE, in order for it to make a finding under the Great Lakes submerged lands act (GLSLA), MCL 324.32501 *et seq*., that "the public trust in the waters will not be impaired or substantially affected" before entering into deeds, leases, or other agreements.  MCL 324.32503(1).  There is nothing in MEPA's text that requires, or even contemplates, such a procedure.  Rather, MEPA requires the factfinder—be it a court or an agency—to *determine* the environmental consequences.  MCL 324.1704(2) allows a *court* to direct the parties to seek relief in administrative proceedings, but no separate provision grants *agencies* the ability to do so.  In addition, relying on the GLSLA to supply common-law public trust standards would be inconsistent with *Glass*, in which this Court held that

factfinder must assess and mitigate harm to the water and the air, so too must it assess and mitigate harm to public trust resources.

## 2. PUBLIC TRUST APPLICATION

The PSC did not determine whether the Replacement Project would "pollute, impair, or destroy" the public trust in its MEPA analysis. We cannot fault it for this failure, because there was little authority on this issue prior to our decision today. Even so, it was error. On remand, the PSC must determine the Replacement Project's effects on the public trust pursuant to the common-law principles discussed in this opinion.[42]

## VI. CONCLUSION

For the reasons given above, we conclude that the Court of Appeals erred by failing to review the PSC's decision independently and de novo. We also conclude that the PSC erred by failing to fully assess the Replacement Project's potential harms, and specifically whether the Replacement Project will factually and proximately cause Line 5's extended operation; by considering the environmental damage possible for the entire scope of the

---

"the GLSLA does not define the scope of the public trust doctrine in Michigan." *Glass*, 473 Mich at 683, 685. Because the common-law public trust doctrine and the GLSLA are distinct, we decline FLOW's invitation to import GLSLA standards into MEPA, which instead incorporates common-law public trust principles. We do note, however, that MEPA does not *bar* multiple agencies from voluntarily collaborating on an environmental review when the circumstances make it desirable or convenient to do so—but neither does it require it.

[42] The dissent agrees that the public trust must be considered on remand and references several findings that already exist in the record that could inform the public trust analysis. We agree that the record likely contains facts that will inform the analysis but also note that because the PSC did not previously consider the public trust as that doctrine is defined by common law, additional factfinding may also be required.

57

considered alternatives compared to just the harms of the Replacement Project; and by failing to consider the public trust in its MEPA analysis.

We reverse the judgment of the Court of Appeals, vacate the PSC's order approving the construction of the Replacement Project, and remand to the PSC for further proceedings consistent with this opinion. On remand, the PSC must fully assess the Replacement Project's potential harms. The PSC must also conduct a fair and consistent comparison of the Replacement Project's environmental impacts with those of the alternatives. And the PSC must consider the extent to which the Replacement Project may pollute, impair, or destroy public trust resources.

We do not retain jurisdiction.

Elizabeth M. Welch
Megan K. Cavanagh
Richard H. Bernstein
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

58

STATE OF MICHIGAN

SUPREME COURT

---

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

---

LITTLE TRAVERSE BAY BANDS OF
ODAWA INDIANS,

        Appellant,

v

No. 168335

MICHIGAN PUBLIC SERVICE
COMMISSION, MACKINAC STRAITS
CORRIDOR AUTHORITY, MICHIGAN
PROPANE GAS ASSOCIATION, NATIONAL
PROPANE GAS ASSOCIATION, and
MICHIGAN LABORERS' DISTRICT
COUNCIL,

        Appellees,

and

ENBRIDGE ENERGY LIMITED
PARTNERSHIP,

        Petitioner-Appellee.

---

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

---

BAY MILLS INDIAN COMMUNITY,

        Appellant,

v

No. 168336

MICHIGAN PUBLIC SERVICE
COMMISSION, MACKINAC STRAITS
CORRIDOR AUTHORITY, MICHIGAN
PROPANE GAS ASSOCIATION, NATIONAL
PROPANE GAS ASSOCIATION, and
MICHIGAN LABORERS' DISTRICT
COUNCIL,

        Appellees,

and

ENBRIDGE ENERGY LIMITED
PARTNERSHIP,

        Petitioner-Appellee.

---

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

---

GRAND TRAVERSE BAND OF OTTAWA
AND CHIPPEWA INDIANS,

        Appellant,

No. 168337

v

MICHIGAN PUBLIC SERVICE
COMMISSION, MACKINAC STRAITS
CORRIDOR AUTHORITY, MICHIGAN
PROPANE GAS ASSOCIATION, NATIONAL
PROPANE GAS ASSOCIATION, and
MICHIGAN LABORERS' DISTRICT
COUNCIL,

        Appellees,

and

2

ENBRIDGE ENERGY LIMITED
PARTNERSHIP,

   Petitioner-Appellee.


*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

---

NOTTAWASEPPI HURON BAND OF THE
POTAWATOMI,

   Appellant,

v                 No. 168338

MICHIGAN PUBLIC SERVICE
COMMISSION, MACKINAC STRAITS
CORRIDOR AUTHORITY, MICHIGAN
PROPANE GAS ASSOCIATION, NATIONAL
PROPANE GAS ASSOCIATION, and
MICHIGAN LABORERS' DISTRICT
COUNCIL,

   Appellees,

and

ENBRIDGE ENERGY LIMITED
PARTNERSHIP,

   Petitioner-Appellee.

---

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

---

ENVIRONMENTAL LAW & POLICY
CENTER and MICHIGAN CLIMATE ACTION
NETWORK,

   Appellants,

3

v                                                    No. 168339

MICHIGAN PUBLIC SERVICE
COMMISSION, MACKINAC STRAITS
CORRIDOR AUTHORITY, MICHIGAN
PROPANE GAS ASSOCIATION, NATIONAL
PROPANE GAS ASSOCIATION, and
MICHIGAN LABORERS' DISTRICT
COUNCIL,

        Appellees,

and

ENBRIDGE ENERGY LIMITED
PARTNERSHIP,

        Petitioner-Appellee.

---

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

---

FOR LOVE OF WATER,

        Appellant,

v                                                    No. 168346

MICHIGAN PUBLIC SERVICE
COMMISSION, MACKINAC STRAITS
CORRIDOR AUTHORITY, MICHIGAN
PROPANE GAS ASSOCIATION, NATIONAL
PROPANE GAS ASSOCIATION, and
MICHIGAN LABORERS' DISTRICT
COUNCIL,

        Appellees,

and

4

ENBRIDGE ENERGY LIMITED
PARTNERSHIP,

            Petitioner-Appellee.

---

ZAHRA, J. (*concurring in part and dissenting in part*).

     Petitioner, Enbridge Energy Limited Partnership, seeks to replace a 4.5-mile portion of its 645-mile Line 5 oil and gas pipeline ("the Replacement Project"). Line 5 was approved in 1953 and has operated and serviced the residents of Michigan and beyond ever since. The Public Service Commission (PSC) approved Enbridge's application to construct the Replacement Project, and the Court of Appeals affirmed in a per curiam published opinion.[1] In this case, the Court reverses the PSC's decision in nearly every aspect.

     I disagree with the conclusions reached in the majority opinion in several respects. First, the majority opinion does not provide the PSC's decision any degree of deference. Some level of deference is generally afforded to administrative decision-makers because of their expertise in the regulated field. The Court of Appeals did not err in affording deference to the PSC, which "is an expert and impartial regulator, committed to protecting consumers while promoting fairness, transparency, and trust in Michigan's energy and utility sectors."[2] Second, I disagree with the Court's expanded scope of analysis under the

---

[1] *In re Application of Enbridge Energy to Replace & Relocate Line 5*, ___ Mich App___; ___ NW3d ___ (February 19, 2025) (Docket Nos. 369156, 369157, 369159, 369161, 369162, 369163, 369165, and 369231).

[2] See Michigan Public Service Commission <https://www.michigan.gov/mpsc> (accessed July 27, 2026).

5

Michigan environmental protection act (MEPA).[3]   The Court holds that the continued operation of Line 5 is itself a relevant adverse environmental effect of the Replacement Project.  This conclusion is poorly reasoned and illogical; worse yet, it creates a moral hazard.   Third, the Court erroneously assumes that these same tenuous, remote, or peripheral environmental effects should be considered relevant to determining feasible alternatives to the Replacement Project.

I concur in the majority opinion limited only to the holding that the matter should be remanded to the PSC for express findings on the issue of public trust.  On this point, I take judicial notice that the Department of Environment, Great Lakes, and Energy (EGLE) recently granted a permit to Enbridge for the Replacement Project, in which the public trust was expressly considered.  On remand, the PSC may well be aided by the recent proceedings in which EGLE approved the Enbridge permit to perform the Replacement Project.

## I.  FACTS AND PROCEDURAL HISTORY

The Line 5 pipeline runs between Superior, Wisconsin, and Sarnia, Ontario.  It spans across Michigan's Upper Peninsula in a 30-inch pipeline before splitting into two parallel 20-inch pipelines (the dual pipelines), which run 4.5 miles across the Straits of Mackinac and lie on the lake bottom.  In the Lower Peninsula, the dual pipelines reunify into a single 30-inch pipeline, which then runs to the city of Marysville.  From there, Line 5 travels

---

[3] MCL 324.1701 through MCL 324.1706.

6

some 30 feet below the St. Clair River through a recently replaced pipeline to Sarnia, Ontario.[4]

In 2018, the state and Enbridge agreed to construct a state-owned utility tunnel beneath the lakebed to be constructed and paid for by Enbridge.[5]  Enbridge sought authorization from the PSC to undertake the Replacement Project to eliminate the dual pipelines running across the bottom of the Straits of Mackinac.  Appellants intervened to oppose the Replacement Project, though they plainly oppose the operation of the Line 5 pipeline in its entirety.

The PSC assigned an administrative law judge (ALJ) to conduct an administrative contested case to determine whether Enbridge's application should be approved.  After the hearing, the PSC decided to forgo a written decision by the ALJ, opting instead to read the record in the case.[6]  The PSC issued its final order on December 1, 2023, authorizing the project conditioned upon Enbridge's securing the necessary governmental permits to proceed with the project.  Appellants appealed the PSC's final order to the Court of Appeals, which affirmed in a published decision.  We granted leave to appeal.

---

[4] Graham, *New Enbridge Line 5 Segment Operating Under Another Part of Great Lakes System*, Michigan Public (August 16, 2020) <https://www.michiganpublic.org/environment-science/2020-08-16/new-enbridge-line-5-segment-operating-under-another-part-of-great-lakes-system> (accessed July 27, 2026).

[5] See 2018 PA 359.

[6] When the PSC "reads the record," it considers the evidence in place of the ALJ, summarizes that evidence, and makes the requisite findings of fact in its final PSC order in the case.  By reading the record, the PSC expedites a case, because it need not await an ALJ's written decision, the filing of exceptions to that decision, or the filing of replies to the exceptions before issuing its order.  This saves several months, if not longer.

7

## II. THE PSC'S DETERMINATION SHOULD BE AFFORDED DEFERENCE

The Court errs by concluding that appellate courts review de novo administrative decisions under MEPA. The Legislature created two different means under MEPA for accomplishing the state's environmental-protection goals.[7] The first is through MCL 324.1701, which provides citizens and the attorney general with a direct cause of action for protection of the state's natural resources (Section 1701 action).[8] The second is MCL 324.1705, which allows citizens or the attorney general to intervene in agency proceedings and imposes obligations on administrative agencies to consider the environmental impacts of their actions (Section 1705 action).[9]

In terms of procedure, Section 1701 actions are brought in circuit court, which may direct the parties to seek relief through administrative, licensing, or other proceedings that are required or available to determine the legality of the defendant's conduct.[10] If the circuit court so directs, those proceedings are conducted in accordance with, and subject to, the Administrative Procedures Act.[11] Then, regardless of whether the circuit court or an agency conducted the proceedings, MCL 324.1704(3) provides:

---

[7] See *State Hwy Comm v Vanderkloot*, 392 Mich 159, 184-185; 220 NW2d 416 (1974) (opinion by WILLIAMS, J.) (discussing Michigan's former Environmental Protection Act, 1970 PA 127, now codified as Part 17 of the Natural Resources and Environmental Protection Act, MCL 324.1701 *et seq.*).

[8] See *State Hwy Comm* (opinion by WILLIAMS, J.), 392 Mich at 184-185.

[9] See *id*.

[10] MCL 324.1704(2).

[11] *Id*.

8

Upon completion of proceedings described in this section, the court shall adjudicate the impact of the defendant's conduct on the air, water, or other natural resources, and on the public trust in these resources, in accordance with this part. In adjudicating an action, the court may order that additional evidence be taken to the extent necessary to protect the rights recognized in this part.

MCL 324.1704(4) makes clear that "the court originally taking jurisdiction shall maintain jurisdiction for purposes of judicial review." Thus, in Section 1701 actions, the circuit court retains original jurisdiction and must take evidence and make specific findings of fact. The upshot is that the circuit court remains the finder of fact because it has "original jurisdiction of the matter, even if it chooses to remit parties to administrative proceedings."[12] This is a unique feature of Section 1701 actions, as PSC decisions are by and large only appealable as of right in the Court of Appeals.[13] MCL 324.1704 does not address any standard of review applicable to Section 1701 actions before the Court of Appeals or this Court. Moreover, nothing in the statutory text suggests or requires our appellate courts to "adjudicate" the case in the same manner required by a circuit court of original jurisdiction.

By contrast, Section 1705 actions are governed by MCL 324.1705, which provides:

(1) If administrative, licensing, or other proceedings and judicial review of such proceedings are available by law, the agency or the court may permit the attorney general or any other person to intervene as a party on the filing of a pleading asserting that the proceeding or action for judicial review involves conduct that has, or is likely to have, the effect of polluting,

---

[12] *West Mich Environmental Action Council v Natural Resources Comm*, 405 Mich 741, 753; 275 NW2d 538 (1979) (discussing Michigan's former Environmental Protection Act); see also MCL 324.1704(4).

[13] MCL 462.26(1). MCL 462.26(2) suggests that appeals from PSC orders were previously reviewed by circuit courts before the effective date of the statute.

impairing, or destroying the air, water, or other natural resources or the public trust in these resources.

(2) In administrative, licensing, or other proceedings, and in any judicial review of such a proceeding, the alleged pollution, impairment, or destruction of the air, water, or other natural resources, or the public trust in these resources, shall be determined, and conduct shall not be authorized or approved that has or is likely to have such an effect if there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety, and welfare.

(3) The doctrines of collateral estoppel and res judicata may be applied by the court to prevent multiplicity of suits.

MCL 324.1705(2) plainly contemplates judicial review but does not describe the judicial review required. However, the Michigan Constitution requires reviewing courts to determine whether agency orders "are authorized by law" and "supported by competent, material and substantial evidence on the whole record."[14] In contrast to Section 1701 actions, where the circuit court exercises original jurisdiction and remains the finder of fact following agency proceedings, the circuit court is *not* acting as a reviewing court in Section 1705 actions. There is similarly no indication that reviewing courts must likewise act as a finder of fact in Section 1705 actions. For instance, there is no separate provision for a reviewing court, in making its decision, to "order that additional evidence be taken."[15] That authority is only provided to a circuit court of original jurisdiction to assess an agency's decision because the circuit court remains the finder of fact. Reviewing courts may remand to the finder of fact to take additional evidence, but reviewing courts are not designated as finders of fact.

---

[14] Const 1963, art 6, § 28.

[15] MCL 324.1704(3).

10

Further, the word "determine[]," as used in MCL 324.1705(2), does not suggest a de novo standard of review is required. Rather, as acknowledged by appellants, the term "determine" merely requires a reviewing court to "come to a decision"[16] about the PSC's determination of environmental effects under MCL 324.1705. Reviewing courts "come to a decision" by reviewing an agency's findings as described in Const 1963, art 6, § 28. MCL 324.1705(2) requires, "as a minimum," see Const 1963, art 6, § 28, that "a reviewing court must ensure that the finding is supported by record evidence," but the court "*does not conduct a new evidentiary hearing and reach its own factual conclusions, nor . . . subject the evidence to review de novo.*"[17] MCL 324.1705(2) requires only a determination by the reviewing courts and nowhere indicates that a de novo standard should apply.[18]

---

[16] *Merriam-Webster.com Dictionary*, determine <https://www.meriam-webster.com/dictionary/determine> (accessed November 13, 2025).

[17] *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 101; 754 NW2d 259 (2008) (emphasis added).

[18] I disagree with the majority opinion that "the phrase 'shall be determined' applies equally to 'administrative, licensing, or other proceedings, *and in any judicial review of such a proceeding*[.]' " (Quoting MCL 324.1705(2); emphasis added in majority opinion.) It is true that all tribunals must ultimately make a "determination" in every case. "[D]etermination is defined as "1. The act of deciding something officially; esp., a final decision by a court or administrative agency <the court's determination of the issue>." *Black's Law Dictionary* (12th ed). And "initial determination" is defined as "[t]he first determination made by the Social Security Administration of a person's eligibility for benefits." *Black's Law Dictionary* (12th ed). But it is also true that tribunals engage in a separate and distinct "legal process of resolving a dispute; the process of judicially deciding a case." *Black's Law Dictionary* (12th ed) (defining "adjudication"). In the context of a Section 1701 action, it makes sense that a trial court engages in "adjudicating" cases as a court of original jurisdiction, while Section 1705 actions only require reviewing courts to make determinations. Here, the majority opinion ignores the clear differences in the text of Sections 1701 and 1705 to erroneously conclude that "the Legislature [did not] intend[]

11

The Court's decision to apply de novo review to these administrative proceedings runs contrary to the typical process for reviewing administrative proceedings.[19] Deference is generally afforded to administrative decision-makers because of their expertise in the regulated field. As previously observed, the PSC "is an expert and impartial regulator, committed to protecting consumers while promoting fairness, transparency, and trust in Michigan's energy and utility sectors."[20] The members of this Court, by contrast, lack expertise in this field. Moreover, the application and approval process that occurred before the PSC involved countless hearings and review proceedings, generating an enormous record that formed the basis of the PSC's findings and opinions. This Court lacks the time and resources to review the entire record, and even if we had the time and resources to do so, our review would proceed without the benefit of industry-specific terminology, customary norms, or the specialized expertise that typically informs the PSC's conclusions, all of which are critical when resolving conflicts in the evidence. As noted by Enbridge:

> There was a colossal record accumulated before the PSC during the nearly four years of the Act 16 proceeding. It includes over 1,400 docket filings; 2,800 pages of hearing transcripts and testimony, rebuttal testimony, sur-rebuttal testimony, sur-sur-rebuttal testimony, sur-sur-sur-rebuttal testimony, and cross-examination; over 11,000 pages of official

---

for the MEPA standard to differ between citizen suits and administrative proceedings," regardless of the type of suit.

[19] The majority suggests that review in citizen lawsuits is purely de novo. This is misleading. While de novo review may apply to the ultimate conclusions reached through a trial court's final determination, the evidentiary record developed by the trial court is reviewed under a deferential standard of review.

[20] Michigan Public Service Commission <https://www.michigan.gov/mpsc> (accessed July 27, 2026).

exhibit filings; over 2,000 pages of briefing-related filings; and scores of public comments.

Applying the proper standard of review is critical to this matter. Under a deferential standard of review, a reviewing court would be hard-pressed to conclude the PSC abused its discretion. Under a de novo standard, the PSC's findings would have no significance and may be dismissed at the whims of a reviewing court. The majority opinion purports to assign to the PSC a significant role in defining the conduct at issue, determining the specific harms at issue, assessing the scope of those harms, considering whether a feasible and prudent alternative to the conduct that mitigates these harms exists, and determining whether to permit or bar the conduct—but the PSC's role is illusory when a reviewing court may simply dismiss its determinations.

In short, de novo review in this case allows the majority to dismiss the PSC's determinations or even substitute its own beliefs for the PSC's findings. The majority opinion seizes this opportunity to embrace the notion that the continued operation of Line 5 itself constitutes an adverse environmental "effect" of the Replacement Project. In doing so, the majority opinion improperly determines that the scope of MEPA includes irrelevant effects and requires consideration of those irrelevant effects when determining whether there are feasible alternatives to the Replacement Project.

III. THE COURT IMPROPERLY BROADENS THE SCOPE OF MEPA REVIEW

MCL 324.1703(1) provides:

> When the plaintiff in the action has made a prima facie showing that the conduct of the defendant has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also show, by way of an affirmative defense, that there is no feasible and

13

prudent alternative to defendant's conduct and that his or her conduct is consistent with the promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment, or destruction.

The PSC prudently determined that "[its] MEPA review does not extend to the entirety of Line 5, including the 641 miles of Line 5 outside of the proposed Replacement Project, but only to the 'replacement of the Dual Pipelines with a new, 30-inch-diameter, single pipeline to be relocated within a new concrete-lined tunnel.' " The majority opinion dismisses the PSC's determination and expands the scope of review to the entirety of Line 5. The majority opinion ignores that the state granted Enbridge's predecessor the authority "to construct, operate and maintain [Line 5] as a common carrier" within Michigan in 1953. In doing so, the PSC expressly rejected the argument that Line 5 was not in the public interest. The continued operation of Line 5 was sanctioned in 1953, despite any tangential environmental effect. The potential adverse effects of Line 5 in its entirety, in any condition of repair or disrepair, is simply not before the Court. While the Replacement Project may have some trace environmental effects on Line 5, those effects do not result in any palpable environmental impact on its continuing operation.

Many people have motor vehicles, power tools, appliances, lawn and garden machines, barbeque grills, and many other innocuous items that cause pollution to some extent. Repairing these items may extend their operational life during which they will continue to pollute. Extending the reasoning of the majority opinion, the continued operation of the repaired items would be deemed to cause an adverse environmental effect, even though the item's environmental impact is no worse, and perhaps even better off, than it was before the repair.

14

Another analogous hypothetical is the replacement of a home's lead water pipes with safer alternatives. The water distribution infrastructure outside the newly replaced pipes is not affected in any manner. The water that flows through the infrastructure is the same, and the amount of water flowing through the infrastructure remains the same. Under these circumstances, no reasonable person would ever expect that replacing lead water pipes in a home would require an environmental assessment of an entire water distribution infrastructure. And imposing such odious regulation would realistically result in homeowners continuing to use the toxic lead pipes or undertaking to replace the lead pipes on their own without any required permit. The reasoning of the majority opinion thus creates a moral hazard that dissuades an environmentally conscious person from making a repair that reduces adverse environmental consequences. In sum, the majority opinion is plainly antithetical to any understanding of MEPA's purpose.

MCL 324.1705(2) limits the scope of an agency's MEPA analysis to the "conduct" at issue in a PSC proceeding and specifically provides that "conduct shall not be authorized or approved that has or is likely to have [environmental effects] if there is a feasible and prudent alternative . . . ." All agree that the "conduct" at issue is the Replacement Project, not Line 5 itself.

Nonetheless, the majority opinion's interpretation of "likely" effects is particularly problematic. The majority opinion's interpretation of the term "effects" is unreasonable and unduly broad in that it encompasses all imaginable effects. The ordinary usage of

15

"effects" does not include " 'tenuous, remote, or peripheral' "[21] effects of conduct. Ordinary readers would not understand the fluttering of a butterfly's wings to have an "effect" on next week's weather.[22]   I would affirm the Court of Appeals' decision upholding the PSC's decision in regard to the scope of MEPA.[23]

## IV.  FEASIBLE ALTERNATIVES

The majority opinion also assumes that these same tenuous, remote, or peripheral environmental effects should be considered relevant in determining feasible alternatives to the Replacement Project.  This too is error.

The PSC considered feasible alternatives to the Replacement Project.  As aptly detailed by the Court of Appeals, some of these alternatives related to the scope of the Replacement Project, such as

> (1) suspending a replacement pipe segment from the Mackinac Bridge and (2) suspending a replacement pipe from a new suspension bridge.  The PSC Staff alternatives were (1) taking no action and allowing the dual pipelines to continue to be used, (2) using an "Open-Cut Alternative" for a pipeline, (3) using a "horizontal directionally drilled" (HDD) method to install a

---

[21] See *Chevron USA Inc v Plaquemines Parish, La*, 608 US ___, ___; 146 S Ct 1052, 1061; 224 L Ed 2d 535 (2026) (stating that "[t]he ordinary understanding of 'relating to' requires a connection that is not 'tenuous, remote, or peripheral' ").

[22] See *id*. at ___; 146 S Ct at 1061, citing Lorenz, *Predictability: Does the Flap of a Butterfly's Wings in Brazil Set Off a Tornado in Texas?*, American Association for the Advancement of Science (Dec 29, 1972) (describing what is now known as the butterfly effect).

[23] In regard to the greenhouse gasses, I would conclude that the Replacement Project does not significantly impact Line 5's continued operations and that these emissions are not attributable to it.  However, I agree with the majority opinion that "Enbridge does not appear to defend this aspect of the PSC's analysis, and argues instead that considering the greenhouse gas emissions was unnecessary, though harmless."

16

pipeline across or under the Straits, (4) protecting the dual pipelines with rock armoring, (5) using alternative transportation for Line 5 products "in a hypothetical post-Line 5 shutdown scenario," and (6) using alternative products from those transported by Line 5.[24]

And some of these alternatives related to the scope of Line 5, such as:

> (1) a new pipeline that does not cross the Great Lakes; (2) use of existing pipeline infrastructure that does not cross the Great Lakes; (3) decommissioning Line 5 and using rail, trucks, or barges to transport Line 5 products from Wisconsin to Canada without the products crossing the Straits; . . . and (6) using alternative transportation such as rail or trucks to transport Line 5 product through the Straits if the dual pipelines were shut down.[25]

The Court faults the PSC with considering proposed alternatives to replace Line 5 as a whole without considering the risks inherent in the continued operation of Line 5. So, for instance, the PSC considered "a new pipeline that does not cross the Great Lakes" and determined that this alternative was not feasible because a new pipeline would need to be much longer and traverse more wetlands than Line 5, ostensibly presenting a greater environmental risk than Line 5. Yet, when considering feasible alternatives to the Replacement Project, the PSC declined to consider the risks inherent in the continued operation of Line 5.

Feasible alternatives must relate to the "conduct" under consideration, which in this case is the Replacement Project. That is, I conclude that consideration of proposed feasible alternatives must be limited to alternatives to the Replacement Project, not alternatives to Line 5 as a whole. While the PSC's discussion of broader alternatives to Line 5 as a whole

---

[24] *In re Application of Enbridge Energy to Replace & Relocate Line 5*, ___ Mich App at ___; slip op at 16.

[25] *Id*. at ___; slip op at 15-16.

may have been misguided since it had previously determined those alternatives were not relevant to the scope of the Replacement Project, any error made by merely considering irrelevant proposed alternatives is insignificant and harmless, since the PSC ultimately approved the Replacement Project.

## V.  PUBLIC TRUST

My only agreement with the majority opinion is that MEPA requires consideration of the public trust in natural resources.  MCL 324.1705(2) expressly requires consideration of "the public trust," and, contrary to the PSC's position, does not require the PSC to adjudicate common-law claims.  The public trust doctrine is a common-law doctrine, but in regard to the Replacement Project, the public trust is expressly defined under the Great Lakes submerged lands act (GLSLA), MCL 324.32501 *et seq*.  One article explains in detail that

> [w]ith respect to the Great Lakes, the administrative rules implementing The Great Lakes Submerged Lands Act define Michigan's public trust doctrine as "the perpetual duty of the [S]tate to secure to its people the prevention of pollution, impairment or destruction of its natural resources, and the rights of navigation, fishing, hunting and use of its lands and waters for other public purposes."  The statute covers all unpatented bottomlands and human-made lands in the Great Lakes—including the bays and harbors thereof—that belong to the State or are held in trust by the State, as well as filled lands.  The Act allows for the sale, lease, or other disposition of the unpatented bottomlands and permits, filling submerged lands as long as the fill does not substantially 1) affect public use of the lands (i.e., hunting, fishing, swimming, or navigation) or 2) damage the public trust in the submerged lands.  A riparian owner must obtain a State permit before dredging or placing any materials on the bed of the Great Lakes.[26]

---

[26] Frey & Mutz, *The Public Trust in Surface Waterways and Submerged Lands of the Great Lakes States*, 40 U Mich JL Reform 907, 932 (2007) (citations omitted; second alteration in original).

18

The PSC operated under the belief that it lacked authority to consider the common-law public trust doctrine. While the PSC has no authority to decide common-law claims, it does have the authority to decide the public trust as provided in MEPA. And it would be widely misleading to suggest that the PSC did not consider the public trust as required under MEPA throughout its 349-page decision, as the PSC noted, for instance:

1. Increased noise generated from construction operations that may impact nearby residences and fauna.

2. Increased dust/particulates generated during construction that may impact nearby residences and fauna and possibly impact surface water.

3. Increased light generated from construction operations that may impact nearby residences and fauna.

4. Increased light from construction and operation of the project that could have potential impacts to the Headlands International Dark Sky Park located south and west of the southern workspace.

5. Surface water impairments:

   a. Impacts such as dewatering operations during construction of the tunnel.

   b. Impacts associated with construction equipment traffic.

   c. Impacts associated with using lake water for hydrostatic testing of the pipe.

6. Environmental impairments to local residences and fauna associated with construction.

7. Air quality impacts associated with use of additional internal combustion engines during construction and operation.

8. Groundwater impacts:

   a. Impacts to groundwater during construction due to spills of hazardous materials from construction equipment.

   b. Impacts to drinking water wells due to construction.

19

c. Impacts to shallow groundwater aquifers and groundwater quality during trenching, excavation, and backfilling maintenance activities.

d. Impacts to surface drainage and groundwater recharge patterns altered by clearing, grading, trenching, and soil stockpiling activities, potentially causing minor fluctuations in groundwater levels and/or increased turbidity, particularly in shallow surficial aquifers.

e. Reduced infiltration and increased surface runoff and ponding due to soil compaction caused by heavy construction vehicles.

9. Environmental impacts to surface soils, vegetation, and surface water due to storage and handling of fuels/hazardous liquids during construction and operation.

10. Impacts to local flora and fauna due to the introduction of aquatic invasive animals and plants during construction.

Given the thoroughness of the PSC's final decision, it is difficult to imagine how the PSC would find that the Replacement Project violated the public trust. Still, the majority opinion is correct that the PSC must make its own determination of the public trust. As the majority notes, "MEPA does not *bar* multiple agencies from voluntarily collaborating on an environmental review when the circumstances make it desirable or convenient to do so . . . ." Along these lines, I note that EGLE has recently approved Enbridge's permit to construct the Replacement Project pursuant to the GLSLA. EGLE published an explanation of its finding regarding the public trust, which provides:

[MCL 324.30311(2)] lists several criteria which are to be considered when balancing the benefits and detriments of the project in making a determination regarding the public interest. These include: the relative need for the project; the availability of feasible and prudent alternatives; the benefits and detriments of the proposed activity on public and private uses; the probable cumulative effects of this and other anticipated activities in the watershed; the probable effects on recognized historical, cultural, and

20

recreational values; the size of wetland; the amount of wetland remaining in the area; the proximity to a waterway; and the economic value both public and private of the proposed project.

Based on these criteria, EGLE finds that the relative extent of the public and private need for the proposed activity, including consideration of the unacceptable risk of the current dual pipelines, outweighs the other public interest criteria.[27]

I would remand to the PSC for consideration of the public trust issue in the first instance, with instruction that the PSC consider EGLE's determination of the public trust.

## VI. CONCLUSION

The majority opinion reaches its desired result under the guise of de novo review by dismissing the PSC's reasonable determinations. The majority opinion then embraces the false premise that the continued use of Line 5 is itself an adverse environmental effect. Line 5 has already been determined to be in the public interest, and its continued operation is the result of the authority the state granted Enbridge's predecessor to construct, use, and maintain Line 5, not the Replacement Project. The Replacement Project will not increase the amount of pollution created by the operation of Line 5. And while the PSC erroneously considered feasible alternatives to the entirety of Line 5, the PSC did properly consider feasible alternatives to the Replacement Project. Finally, while the PSC did not expressly consider the public trust in its final opinion, the opinion clearly addresses the substance of the public trust in the state's natural resources.

---

[27]See Department of Environment, Great Lakes, and Energy, *Explanation of Findings for WRP049588 v1.0*, available at <https://mienviro.michigan.gov/nsite/default/map/results/detail/2746869251480183093/Documents> (accessed July 20, 2026) [https://perma.cc/UX45-CBE7].

Nonetheless, I would remand to the PSC to independently address the public trust, aided by EGLE's recent approval of Enbridge's permit regarding the Replacement Project, in which the public trust was expressly considered.

Brian K. Zahra